[No. S122923. Aug. 12, 2004.]

BILL LOCKYER, as Attorney General, etc., Petitioner, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Respondents.

[No. S122865. Aug. 12, 2004.]

BARBARA LEWIS et al., Petitioners, v.
NANCY ALFARO, as County Clerk, etc., Respondent.

1062

1064

COUNSEL

Bill Lockyer, Attorney General, Andrea Lynn Hoch, Chief Assistant Attorney General, Louis R. Mauro, Assistant Attorney General, Kathleen A. Lynch, Zackery Morazzini, Hiren Patel, Timothy M. Muscat, Douglas J. Woods and Christopher E. Krueger, Deputy Attorneys General, for Petitioner Bill Lockyer, as Attorney General of the State of California.

Alliance Defense Fund, Benjamin W. Bull, Jordan W. Lorence, Gary S. McCaleb, Glen Lavy, Robert H. Tyler; Center for Marriage Law, Vincent P. McCarthy; Law Offices of Terry L. Thompson and Terry L. Thompson for Petitioners Barbara Lewis, Charles McIlhenny and Edward Mei.

Liberty Counsel, Mathew D. Staver, Rena M. Lindevaldsen; and Ross S. Heckmann for Randy Thomasson and Campaign for California Families as Amici Curiae on behalf of Petitioner Bill Lockyer, as Attorney General of the State of California.

Divine Queen Mariette Do-Nguyen as Amicus Curiae on behalf of Petitioner Bill Lockyer, as Attorney General of the State of California.

Law Offices of Peter D. Leposcopo and Peter D. Leposcopo for California Senators William J. ("Pete") Knight, Dennis Hollingsworth, Rico Oller, Bill Morrow, Thomas McClintock, Dick Ackerman, Samuel Aanestad, Bob Margett, Ross Johnson, Jim F. Battin, Jr., California Assembly Members Ray Haynes, George A. Plescia, Tony Strickland, Bill Maze, Robert Pacheco, Doug La Malfa, Guy S. Houston, Steven N. Samuleian, Dave Codgill, Tom Harman, Dave Cox, Patricia C. Bates, Russ Bogh, Kevin McCarthy, Todd Spitzer, Alan Nakanishi, Keith S. Richman, Shirley Horton, Sharon Runner, Jay La Suer and Pacific Justice Institute as Amici Curiae on behalf of Petitioners Barbara Lewis, Charles McIlhenny and Edward Mei.

Dennis J. Herrera, City Attorney, Therese M. Stewart, Chief Deputy City Attorney, Ellen Forman, Wayne K. Snodgrass, Thomas S. Lakritz, K. Scott Dickey, Kathleen S. Morris, Sherri Sokeland Kaiser, Deputy City Attorneys; Howard Rice Nemerovski Canady Falk & Rabkin, Bobbie J. Wilson, Pamela K. Fulmer, Amy E. Margolin, Sarah M. King, Kevin H. Lewis, Ceide Zapparoni, Glenn M. Levy and Chandra Miller Fienen for Respondents.

Alma Marie Triche-Winston and Charel Winston as Amici Curiae on behalf of Respondents.

Law Offices of Waukeen Q. McCoy and Waukeen Q. McCoy for Dr. Anthony Bernan, Andrew Neugebauer, Stephanie O'Brien, Janet Levy, Dr. Gregory Clinton, Gregory Morris, Joseph Falkner, Arthur Healey, Kristin Anderson, Michele Betegga, Derrick Anderson and Wayne Edfors II as Amici Curiae on behalf of Respondents.

Morrison & Foerster, Ruth N. Borenstein, Stuart C. Plunkett and Johnathan E. Mansfield for Marriage Equality California, Inc., and Twelve Married Same-Sex Couples as Amici Curiae on behalf of Respondents.

Ann Miller Ravel, County Counsel (Santa Clara) and Martin H. Dodd, Assistant County Counsel, as Amici Curiae on behalf of Respondents.

Dana McRae, County Counsel (Santa Cruz), Shannon M. Sullivan and Jason M. Heath, Assistant County Counsel, as Amici Curiae on behalf of Respondents.

Bingham McCutchen, John R. Reese, Matthew S. Gray, Susan Baker Manning, Huong T. Nguyen and Danielle Merida for Bay Area Lawyers for Individual Freedom as Amicus Curiae on behalf of Respondents.

National Center for Lesbian Rights, Shannon Minter, Courtney Joslin; Heller Ehrman White & McAuliffe, Stephen V. Bomse, Richard DeNatale, Hilary E. Ware; ACLU of Southern California, Martha A. Matthews; Lambda Legal Defense and Education Fund, Jon W. Davidson, Jennifer C. Pizer; Steefel, Levitt & Weiss, Dena L. Narbaitz, Clyde J. Wadsworth; ACLU Foundation of Northern California, Tamara Lange, Alan I. Schlosser; Law Office of David C. Codell, David C. Codell and Aimee Dudovitz for Del Martin and Phyllis Lyon, Sarah Conner and Gillian Smith, Margot McShane and Alexandra D'Amario, Dave Scott Chandler and Jeffrey Wayne Chandler, Theresa Michelle Petry and Cristal Rivera-Mitchel, Lancy Woo and Cristy Chung, Joshua Rymer and Tim Frazer, Jewell Gomez and Diane Sabin, Myra Beals and Ida Matson, Arthur Frederick Adams and Devin Wayne Baker, Jeanne Rizzo and Pali Cooper, Our Family Coalition and Equality California as Amici Curiae on behalf of Respondents.

Roger Jon Diamond as Amicus Curiae on behalf of Respondents.

**OPINION**

**GEORGE, C. J.**—We assumed jurisdiction in these original writ proceedings to address an important but relatively narrow legal issue—whether a local executive official who is charged with the ministerial duty of enforcing a state

statute exceeds his or her authority when, without any court having determined that the statute is unconstitutional, the official deliberately declines to enforce the statute because he or she determines or is of the opinion that the statute is unconstitutional.

In the present case, this legal issue arises out of the refusal of local officials in the City and County of San Francisco to enforce the provisions of California's marriage statutes that limit the granting of a marriage license and marriage certificate only to a couple comprised of a man and a woman.

The same legal issue and the same applicable legal principles could come into play, however, in a multitude of situations. For example, we would face the same legal issue if the statute in question were among those that restrict the possession or require the registration of assault weapons, and a local official, charged with the ministerial duty of enforcing those statutes, refused to apply their provisions because of the official's view that they violate the Second Amendment of the federal Constitution. In like manner, the same legal issue would be presented if the statute were one of the environmental measures that impose restrictions upon a property owner's ability to obtain a building permit for a development that interferes with the public's access to the California coastline, and a local official, charged with the ministerial duty of issuing building permits, refused to apply the statutory limitations because of his or her belief that they effect an uncompensated "taking" of property in violation of the just compensation clause of the state or federal Constitution.

Indeed, another example might illustrate the point even more clearly: the same legal issue would arise if the statute at the center of the controversy were the recently enacted provision (operative January 1, 2005) that imposes a ministerial duty upon local officials to accord the same rights and benefits to registered domestic partners as are granted to spouses (see Fam. Code, § 297.5, added by Stats. 2003, ch. 421, § 4), and a local official—perhaps an officeholder in a locale where domestic partnership rights are unpopular— adopted a policy of refusing to recognize or accord to registered domestic partners the equal treatment mandated by statute, based solely upon the official's view (unsupported by any judicial determination) that the statutory provisions granting such rights to registered domestic partners are unconstitutional because they improperly amend or repeal the provisions of the voter-enacted initiative measure commonly known as Proposition 22, the California Defense of Marriage Act (Fam. Code, § 308.5) without a confirming vote of the electorate, in violation of article II, section 10, subdivision (c) of the California Constitution.

As these various examples demonstrate, although the present proceeding may be viewed by some as presenting primarily a question of the substantive

legal rights of same-sex couples, in actuality the legal issue before us implicates the interest of all individuals in ensuring that public officials execute their official duties in a manner that respects the limits of the authority granted to them as officeholders. In short, the legal question at issue—the scope of the authority entrusted to our public officials—involves the determination of a fundamental question that lies at the heart of our political system: the role of the rule of law in a society that justly prides itself on being "a government of laws, and not of men" (or women).[1]

As indicated above, that issue—phrased in the narrow terms presented by this case—is whether a local executive official, charged with the ministerial duty of enforcing a statute, has the authority to disregard the terms of the statute in the absence of a judicial determination that it is unconstitutional, based solely upon the official's opinion that the governing statute is unconstitutional. As we shall see, it is well established, both in California and elsewhere, that—subject to a few narrow exceptions that clearly are inapplicable here—a local executive official does *not* possess such authority.

■ This conclusion is consistent with the classic understanding of the separation of powers doctrine—that the legislative power is the power to enact statutes, the executive power is the power to execute or enforce statutes, and the judicial power is the power to interpret statutes and to determine their constitutionality. It is true, of course, that the separation of powers doctrine does not create an absolute or rigid division of functions. (*Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 52 [51 Cal.Rptr.2d 837, 913 P.2d 1046].) ■ Furthermore, legislators and executive officials may take into account constitutional considerations in making discretionary decisions within their authorized sphere of action—such as whether to enact or veto proposed legislation or exercise prosecutorial discretion. When, however, a duly enacted statute imposes a ministerial duty upon an executive official to follow the dictates of the statute in performing a mandated act, the official generally has no authority to disregard the statutory mandate based on the official's own determination that the statute is unconstitutional. (See, e.g., *Kendall v. United States* (1838) 37 U.S. 524, 613 [9 L.Ed. 1181] ["To contend, that the obligation imposed on the president to see the

---

[1] The phrase "a government of laws, and not of men" was authored by John Adams (Adams, Novanglus Papers, No. 7 (1774), reprinted in 4 Works of John Adams (Charles Francis Adams ed. 1851) p. 106), and was included as part of the separation of powers provision of the initial Massachusetts Constitution adopted in 1780. (Mass. Const. (1780) Part The First, art. XXX.) The separation of powers provision of that state's Constitution remains unchanged to this day, and reads in full: "In the government of this commonwealth, the legislative department shall never exercise the executive and judicial powers or either of them: the executive shall never exercise the legislative and judicial powers, or either of them: the judicial shall never exercise the legislative and executive powers, or either of them: *to the end it may be a government of laws and not of men.*" (Italics added.)

laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution, and entirely inadmissible"].)

Accordingly, for the reasons that follow, we agree with petitioners that local officials in San Francisco exceeded their authority by taking official action in violation of applicable statutory provisions. We therefore shall issue a writ of mandate directing the officials to enforce those provisions unless and until they are judicially determined to be unconstitutional and to take all necessary remedial steps to undo the continuing effects of the officials' past unauthorized actions, including making appropriate corrections to all relevant official records and notifying all affected same-sex couples that the same-sex marriages authorized by the officials are void and of no legal effect.

■ To avoid any misunderstanding, we emphasize that the substantive question of the constitutional validity of California's statutory provisions limiting marriage to a union between a man and a woman is not before our court in this proceeding, and our decision in this case is not intended, and should not be interpreted, to reflect any view on that issue. We hold only that in the absence of a judicial determination that such statutory provisions are unconstitutional, local executive officials lacked authority to issue marriage licenses to, solemnize marriages of, or register certificates of marriage for same-sex couples, and marriages conducted between same-sex couples in violation of the applicable statutes are void and of no legal effect. Should the applicable statutes be judicially determined to be unconstitutional in the future, same-sex couples then would be free to obtain valid marriage licenses and enter into valid marriages.

# I

The events that gave rise to this proceeding began on February 10, 2004, when Gavin Newsom, the Mayor of the City and County of San Francisco and a respondent in one of the consolidated cases before us,[2] sent a letter to

---

[2] Petitioner in the *Lockyer* matter is Bill Lockyer, the Attorney General of California. The petition in *Lockyer* names as respondents the City and County of San Francisco, Gavin Newsom in his official capacity as Mayor of the City and County of San Francisco, Mabel S. Teng in her official capacity as Assessor-Recorder of the City and County of San Francisco, and Nancy Alfaro in her official capacity as the County Clerk of the City and County of San Francisco.

Petitioners in the *Lewis* matter are Barbara Lewis, Charles McIlhenny, and Edward Mei, San Francisco residents and taxpayers. The petition in *Lewis* names as respondent Nancy Alfaro in her official capacity as the County Clerk of the City and County of San Francisco.

For convenience, in this opinion we generally shall refer to the Attorney General and petitioners in *Lewis* collectively as "petitioners" and to respondents in both *Lockyer* and *Lewis* collectively as "the city" or "the city officials."

Nancy Alfaro, identified in the letter as the San Francisco County Clerk,[3] requesting that she "determine what changes should be made to the forms and documents used to apply for and issue marriage licenses in order to provide marriage licenses on a non-discriminatory basis, without regard to gender or sexual orientation." The mayor stated in his letter that "[t]he Supreme Courts in other states have held that equal protection provisions in their state constitutions prohibit discrimination against gay men and lesbians with respect to the rights and obligations flowing from marriage," and explained that it is his "belief that these decisions are persuasive and that the California Constitution similarly prohibits such discrimination." The mayor indicated that the request to the county clerk was made "[p]ursuant to [his] sworn duty to uphold the California Constitution, including specifically its equal protection clause . . . ."[4]

In response to the mayor's letter, the county clerk designed what she describes as "a gender-neutral application for public marriage licenses, and a gender-neutral marriage license," to be used by same-sex couples. The newly designed form altered the official state-prescribed form for the "Application

---

[3] The letter from Mayor Newsom identified Alfaro as the San Francisco County Clerk. In its answer to the petition for writ of mandate in *Lockyer*, filed in this court on March 18, 2004, however, the city alleges "that Daryl M. Burton is the San Francisco County Clerk, and that Nancy Alfaro is the Director of the County Clerk's Office, to whom all of the responsibilities and privileges of County Clerk have been delegated." The answer further alleges that "as Burton's delegate, Nancy Alfaro is the designated 'commissioner of civil marriages' for San Francisco." Alfaro has filed a declaration stating that she is the Director of the County Clerk's Office for the City and County of San Francisco and that "[i]n that capacity I perform all the duties, and hold all the responsibilities of, the County Clerk. These duties include the issuance of all marriage licenses." Petitioners do not contend that Alfaro is not the official authorized to perform the duties assigned by the applicable statutes to the county clerk, and thus we shall consider Alfaro the county clerk for purposes of this proceeding.

[4] The letter read in full: "Upon taking the Oath of Office, becoming the Mayor of the City and County of San Francisco, I swore to uphold the Constitution of the State of California. Article I, Section 7, subdivision (a) of the California Constitution provides that '[a] person may not be . . . denied equal protection of the laws.' The California courts have interpreted the equal protection clause of the California Constitution to apply to lesbians and gay men and have suggested that laws that treat homosexuals differently from heterosexuals are suspect. The California courts have also stated that discrimination against gay men and lesbians is invidious. The California courts have held that gender discrimination is suspect and invidious as well. The Supreme Courts in other states have held that equal protection provisions in their state constitutions prohibit discrimination against gay men and lesbians with respect to the rights and obligations flowing from marriage. It is my belief that these decisions are persuasive and that the California Constitution similarly prohibits such discrimination.

"Pursuant to my sworn duty to uphold the California Constitution, including specifically its equal protection clause, I request that you determine what changes should be made to the forms and documents used to apply for and issue marriage licenses in order to provide marriage licenses on a non-discriminatory basis, without regard to gender or sexual orientation."

for Marriage License" and the "License and Certificate of Marriage" by eliminating the terms "bride," "groom," and "unmarried man and unmarried woman," and by replacing them with the terms "first applicant," "second applicant," and "unmarried individuals." The revised form also contained a new warning at the top of the form, advising applicants that "[b]y entering into marriage you may lose some or all of the rights, protections and benefits you enjoy as a domestic partner" and that "marriage of gay and lesbian couples may not be recognized as valid by any jurisdiction other than San Francisco, and may not be recognized as valid by any employer," and encouraging same-sex couples "to seek legal advice regarding the effect of entering into marriage."[5]

The county clerk, using the altered forms, began issuing marriage licenses to same-sex couples on February 12, 2004, and the county recorder thereafter registered marriage certificates submitted on behalf of same-sex couples who had received licenses from the city and had participated in marriage ceremonies. The declaration of the county clerk, filed in this court on March 5, 2004, indicates that as of that date, the clerk had issued more than approximately 4,000 marriage licenses to same-sex couples. In more recent filings, the city has indicated that approximately 4,000 same-sex marriages have been performed under licenses issued by the County Clerk of the City and County of San Francisco.

On February 13, 2004, two separate actions were filed in San Francisco County Superior Court seeking to halt the city's issuance of marriage licenses to same-sex couples and the solemnization and registration of marriages of such couples. (*Thomasson v. Newsom* (Super. Ct. S.F. City and County, 2004, No. CGC-04-428794); *Proposition 22 Legal Defense and Education Fund v. City and County of San Francisco* (Super. Ct. S.F. City and County, 2004, No. CPF-04-50943) (hereafter *Proposition 22 Legal Defense*).) In each case, a request for an immediate stay of the city's actions was denied by the superior court after a hearing.[6]

---

[5] The warning reads in full: "Please read this carefully prior to completing the application: [¶] By entering into marriage you may lose some or all of the rights, protections, and benefits you enjoy as a domestic partner, including, but not limited to those rights, protections, and benefits afforded by State and local government, and by your employer. If you are currently in a domestic partnership, you are urged to seek legal advice regarding the potential loss of your rights, protections, and benefits before entering into marriage. [¶] Marriage of gay and lesbian couples may not be recognized as valid by any jurisdiction other than San Francisco, and may not be recognized as valid by any employer. If you are a same-gender couple, you are encouraged to seek legal advice regarding the effect of entering into marriage."

[6] On February 17, 2004, the superior court, in addition to declining to grant the request for an immediate stay, issued an alternative writ in *Proposition 22 Legal Defense*, directing the city to cease and desist issuing marriage licenses to same-sex couples or performing marriage ceremonies for such couples, or show cause why the city has not done so, and set a hearing on

On February 27, 2004, the Attorney General filed in this court a petition for an original writ of mandate, prohibition, certiorari, and/or other relief, and a request for an immediate stay. The petition asserted that the actions of the city officials in issuing marriage licenses to same-sex couples and solemnizing and registering the marriages of such couples are unlawful, and that the problems and uncertainty created by the growing number of these marriages justify intervention by this court. The petition pointed out that despite a directive issued by the state Registrar of Vital Statistics, the San Francisco County Recorder had not ceased the practice of registering marriage certificates submitted by same-sex couples on forms other than those approved by the State of California, and that officials of the federal Social Security Administration had raised questions regarding that agency's processing of name-change applications resulting from California marriages—not confined to single-sex marriages—because of the uncertainty as to whether certain marriage certificates issued in California are valid under state law. Noting that "[t]he Attorney General has the constitutional duty to see that the laws of the state are uniformly and adequately enforced" (see Cal. Const., art. V, § 13), the petition maintained that the existing "conflict and uncertainty, and the potential for future ambiguity, instability, and inconsistent administration among various jurisdictions and levels of government, present a legal issue of statewide importance that warrants immediate intervention by this Court." The petition requested that this court issue an order (1) directing the local officials to comply with the applicable statutes in issuing marriage licenses and certificates, (2) declaring invalid the same-sex marriage licenses and certificates that have been issued, and (3) directing the city to refund any fees collected in connection with such licenses and certificates.

Anticipating that the respondent city officials likely would oppose the petition by arguing that the applicable state laws are unconstitutional, the petition maintained that such a claim could not justify the officials' issuance of same-sex marriage licenses in violation of state law "because article III, section 3.5 of the California Constitution prohibits administrative agencies from declaring state laws unconstitutional in the absence of an appellate court determination." The petition asserted that "[t]he county is a political subdivision of the state charged with administering state government, and local registrars of vital statistics act as state officers. The state's agents at the local level simply cannot refuse to enforce state law."

the show cause order for March 29, 2004. On February 19, 2004, the city filed a cross-complaint for declaratory relief against the State of California in *Proposition 22 Legal Defense*, seeking a declaration that the California statutes that deny the issuance of marriage licenses to same-sex couples are unconstitutional.

Although the Attorney General's petition acknowledged that the court could grant the relief requested in the petition without reaching the substantive question of the constitutionality of the California statutes limiting marriage to a man and a woman, the petition urged that we also resolve the substantive constitutional issue at this time, arguing that "[a]s the issues presented are pure legal issues, and there is no need for the development of a factual record, these issues are ready for this Court's review."

On February 25, 2004, two days prior to the filing of the petition in *Lockyer*, the petition in *Lewis* was filed in this court. In *Lewis*, three residents and taxpayers in the City and County of San Francisco sought a writ of mandate to compel the county clerk to cease and desist issuing marriage licenses to couples other than those who meet state law marriage requirements and on forms that do not comply with state law license requirements, and also sought an immediate stay pending the court's determination of the petition.

After receiving the petitions in *Lockyer* and *Lewis*, we requested that the city file an opposition to the petition in each case on or before March 5, 2004. The city filed its opposition to the petitions on March 5, arguing that the provisions of article III, section 3.5 of the California Constitution do not apply to local officials and that, in any event, under the supremacy clause of the United States Constitution, California Constitution article III, section 3.5 could not properly be applied to preclude a local official from refusing to enforce a statute that the official believes violates the federal Constitution. With regard to the question of the constitutionality of California's statutory ban on same-sex marriages, the opposition maintained that "the issue is one best left to the lower courts in the first instance to undertake the extensive fact-finding that will be necessary."[7]

On March 11, 2004, we issued an order in both *Lockyer* and *Lewis* directing the city officials to show cause why a writ of mandate should not issue requiring the officials to apply and abide by the current California marriage statutes in the absence of a judicial determination that the statutory provisions are unconstitutional. Pending our determination of these matters, we directed the officials to enforce the existing marriage statutes and refrain from issuing marriage licenses or certificates not authorized by such provisions. We also stayed all proceedings in the two pending San Francisco County Superior Court cases (the *Proposition 22 Legal Defense* action and the *Thomasson v. Newsom* action), but specified that the stay "does not

---

[7] The petition in *Lewis*—filed by parties who maintain that the existing California marriage statutes are constitutional—similarly took the position that "[t]he constitutionality of the marriage laws is an issue best left to full development in the lower courts."

preclude the filing of a separate action in superior court raising a substantive constitutional challenge to the current marriage statutes."

Our March 11 order also specified that the return to be filed by the city officials in each case was to be limited "to the issue whether respondents are exceeding or acting outside the scope of their authority in refusing to enforce the provisions of Family Code sections 300, 301, 308.5, and 355 in the absence of a judicial determination that such provisions are unconstitutional," and that in addressing this issue, the return "should discuss not only the applicability and effect of article III, section 3.5 of the California Constitution" but also any other constitutional or statutory provisions or legal doctrines that bear on the question whether the city officials acted outside the scope of their authority in refusing to comply with the applicable statutes in the absence of a judicial determination that the statutes are unconstitutional.

Our March 11 order further established an expedited briefing schedule and indicated that the court would hear oral argument in these matters at its late May 2004 or June 2004 oral argument calendar. After receiving the briefs filed by the parties and numerous amici curiae, we requested that the parties file supplemental letter briefs addressing several questions relating to the validity of the marriage licenses and certificates of registry of marriage that already had been issued or registered by city officials to or on behalf of same-sex couples. The supplemental briefs were timely filed, and the cases were argued before this court on May 25, 2004. After oral argument, we filed an order consolidating the two cases for decision.

## II

██ It is well settled in California that "the Legislature has full control of the subject of marriage and may fix the conditions under which the marital status may be created or terminated. . . ." (*McClure v. Donovan* (1949) 33 Cal.2d 717, 728 [205 P.2d 17].) "The regulation of marriage and divorce is solely within the province of the Legislature, except as the same may be restricted by the Constitution." (*Beeler v. Beeler* (1954) 124 Cal.App.2d 679, 682 [268 P.2d 1074]; see, e.g., *Estate of DePasse* (2002) 97 Cal.App.4th 92, 99 [118 Cal.Rptr.2d 143].) In view of the primacy of the Legislature's role in this area, we begin by setting forth the relevant statutes relating to marriage that have some bearing on the issue before us. As we shall see, the Legislature has dealt with the subject of marriage in considerable detail.

As applicable to the issues presented by this case, the relevant statutes dealing with marriage are contained in the Family Code and the Health and Safety Code.

█ The provisions regarding the validity of marriage are set forth in Family Code sections 300 to 310.

Section 300 provides in full: *"Marriage is a personal relation arising out of a civil contract between a man and a woman*, to which the consent of the parties capable of making that contract is necessary. Consent alone does not constitute marriage. Consent must be followed by the issuance of a license and solemnization as authorized by this division, except as provided by Section 425[8] and Part 4 (commencing with Section 500).[9]" (Italics added.)

Section 301 provides: *"An unmarried male of the age of 18 years or older, and an unmarried female of the age of 18 or older*, and not otherwise disqualified, *are capable of consenting to and consummating marriage."* (Italics added.)

Section 308.5 provides: *"Only marriage between a man and a woman is valid or recognized in California."* (Italics added.)

In the opposition filed in this court, the city takes the position that neither section 301 nor section 308.5 is relevant to the question whether current California statutes limit marriages performed in California to marriages between a man and a woman,[10] but the city concedes that section 300, both

---

[8] Family Code section 425 provides: "If no record of the solemnization of a marriage previously contracted is known to exist, the parties may purchase a License and Certificate of Declaration of Marriage from the county clerk in the parties' county of residence." Family Code section 350 provides that "[b]efore . . . declaring a marriage pursuant to Section 425, the parties shall first obtain a marriage license from a county clerk." As the Court of Appeal explained in *Estate of DePasse, supra,* 97 Cal.App.4th 92, 104, "[t]he purpose of the [section 425] procedure is to create a record of an otherwise unrecorded marriage, thus focusing on the registration requirement, as opposed to the licensing requirement." The section 425 procedure has no bearing on the issues presented by this case.

[9] Part 4 of division 3 of the Family Code (§§ 500–536) governs confidential marriages. With respect to the issue presented in this case, the provisions governing confidential marriages parallel the provisions governing ordinary marriages. (Compare, e.g., Fam. Code, § 505 [specifying form of confidential marriage license] with Fam. Code, § 355 [specifying form of ordinary marriage license].)

[10] With respect to section 301—which, as noted above, provides that "[a]n unmarried male of the age of 18 years or older, and an unmarried female of the age of 18 years or older, . . . are capable of consenting to and consummating marriage"—the opposition filed in this court maintains that "the statute is silent as to whom an unmarried male and an unmarried female may marry, and thus is irrelevant." Petitioners maintain, by contrast, that section 301 clearly contemplates that a marriage will be consummated between an unmarried male and unmarried female.

With regard to section 308.5—which provides that "[o]nly marriage between a man and woman is valid or recognized in California"—the opposition maintains that, in light of the provision's history, "[t]his statute is irrelevant to the case at hand because it addresses only

by its terms and its purpose, imposes such a limitation on marriages performed in California.[11] Because we agree that section 300 clearly establishes that current California statutory law limits marriage to couples comprised of a man and a woman, we need not and do not address the scope or effect of sections 301 and 308.5 in this case.

The Family Code provisions relating to marriage licenses and to the certificate of registry of marriage are set forth in Family Code sections 350 to 360. These statutes provide that "before entering a marriage, . . . the parties shall first obtain a marriage license from a county clerk" (Fam. Code, § 350), and the provisions state what information must be contained on the license (Fam. Code, § 351) and place the responsibility on the county clerk to ensure that the statutory requirements for obtaining a marriage license are satisfied. (Fam. Code, § 354.) The statutes also specifically provide that the forms for (1) the application for a marriage license, (2) the marriage license, and (3) the certificate of registry of marriage that are to be used by the county clerk and provided to the applicants "shall be prescribed by the State Department of Health Services." (Fam. Code, §§ 355, 359.)[12]

out-of-state marriages." Petitioners assert, by contrast, that by specifying that only marriage between a man and woman is "valid" or "recognized" in California, section 308.5 addresses both in-state and out-of-state marriages.

[11] The language in Family Code section 300 specifying that marriage is a relation "between a man and a woman" was adopted by the Legislature in 1977, when the provision was set forth in former section 4100 of the Civil Code. (Stats. 1977, ch. 339, § 1, p. 1295, introduced as Assem. Bill 607 (1977–1978 Reg. Sess.).) The legislative history of the measure makes its objective clear. (See Sen. Com. on Judiciary, Analysis of Assem. Bill No. 607 (1977–1978 Reg. Sess.) as amended May 23, 1977, p. 1 ["The purpose of the bill is to prohibit persons of the same sex from entering lawful marriage"].) The provisions of Civil Code former section 4100 were moved to Family Code section 300 when the Family Code was enacted in 1992. (Stats. 1992, ch. 162, § 10, p. 474.)

[12] Family Code section 350 provides: "*Before entering a marriage*, or declaring a marriage pursuant to Section 425, *the parties shall first obtain a marriage license from a county clerk.*" (Italics added.)

Section 351 provides: "The marriage license shall show all of the following: [¶] (a) The identity of the parties to the marriage. [¶] (b) The parties' real and full names, and places of residence. [¶] (c) The parties' ages."

Section 354 provides: "(a) Each applicant for a marriage license may be required to present authentic identification as to name. [¶] (b) *For the purpose of ascertaining the facts mentioned or required in this part, if the clerk deems it necessary, the clerk may examine the applicants for a marriage license on oath at the time of the application.* The clerk shall reduce the examination to writing and the applicants shall sign it. [¶] (c) *If necessary, the clerk may request additional documentary proof as to the accuracy of the facts stated.* [¶] (d) Applicants for a marriage license shall not be required to state, for any purpose, their race or color." (Italics added.)

Section 355 provides: "(a) *The forms for the application for a marriage license and the marriage license shall be prescribed by the State Department of Health Services, and shall be adapted to set forth the facts required in this part.* [¶] (b) The form for the application for a marriage license shall include an affidavit on the back, which the applicants shall sign,

Provisions regarding the solemnization of marriage are set forth in Family Code sections 400 to 425. These statutes contain a list of the numerous persons who may solemnize a marriage under California law (Fam. Code, § 400), and require the person solemnizing a marriage (1) to require the applicants to present the marriage license to him or her prior to solemnization (Fam. Code, § 421), (2) to sign and endorse upon or attach to the marriage license a statement, "in the form prescribed by the State Department of Health Services," setting forth specified information (Fam. Code, § 422), and (3) to return the marriage license, with the requisite endorsement, to the county recorder of the county in which the license was issued within 30 days after the marriage ceremony. (Fam. Code, § 423.)[13]

The Health and Safety Code contains numerous additional provisions prescribing in detail the procedures governing marriage licenses and marriage

---

affirming that they have received the brochure provided for in Section 358. [¶] (c) *The affidavit required by subdivision (b) shall state:*

### AFFIDAVIT
I acknowledge that I have received the brochure titled _____

_____ _____
*Signature of Bride* Date

_____ _____
*Signature of Groom* Date

[End of section 355.]" (Italics added.)

Section 359 provides: "(a) *Applicants for a marriage license shall obtain from the county clerk issuing the license, a certificate of registry of marriage.* [¶] (b) *The contents of the certificate of registry are as provided in Division 9 (commencing with Section 102100) of Division 102 of the Health and Safety Code.* [¶] (c) The certificate of registry shall be filled out by the applicants, *in the presence of the county clerk issuing the marriage license,* and shall be presented to the person solemnizing the marriage. [¶] (d) The person solemnizing the marriage shall complete the registry and shall cause to be entered on the certificate of registry the signature and address of one witness to the marriage ceremony. [¶] (e) The certificate of registry shall be returned by the person solemnizing the marriage *to the county recorder of the county in which the license was issued* within 10 days after the ceremony. [¶] (f) As used in this division, 'returned' means presented to the appropriate person in person, or postmarked, before the expiration of the specified time period." (Italics added.)

[13] Family Code section 421 provides in relevant part: "Before solemnizing a marriage, the person solemnizing the marriage shall require the presentation of the marriage license. . . ."

Section 422 provides in relevant part: "The person solemnizing a marriage shall make, sign, and endorse upon or attach to the marriage license a statement, *in the form prescribed by the State Department of Health Services,* showing all of the following: [¶] (a) The fact, date (month, day, year), and place (city and county) of solemnization. [¶] (b) The names and places of residence of one or more witnesses to the ceremony. [¶] (c) The official position of the person solemnizing the marriage . . . ." (Italics added.)

Section 423 provides: "The person solemnizing the marriage shall return the marriage license, endorsed as required in Section 422, *to the county recorder of the county in which the license was issued* within 10 days after the ceremony." (Italics added.)

certificates as part of the state's registration and maintenance of vital statistics. These statutes designate the California Director of Health Services as the State Registrar of Vital Statistics (Health & Saf. Code, § 102175) and provide that "[e]ach live birth, fetal death, death, and *marriage* that occurs in this state shall be registered as provided in this part *on the prescribed certificate forms. . . .*" (Health & Saf. Code, § 102100, italics added.) The statutes also specify that "[t]he State Registrar is charged with the execution of this part in this state, *and has supervisory power over local registrars, so that there shall be uniform compliance with all the requirements of this part*" (Health & Saf. Code, § 102180, italics added), that "[t]he Attorney General will assist in the enforcement of this part upon request of the State Registrar" (Health & Saf. Code, § 102195), and that "[t]he State Registrar *shall prescribe and furnish all record forms for use in carrying out the purpose of this part, . . . and no record forms or formats other than those prescribed shall be used.*" (Health & Saf. Code, § 102200, italics added.)[14] The code also contains a specific provision pertaining to all of the official forms related to marriage, which expressly provides that "[*t*]*he forms for the application for license to marry, the certificate of registry of marriage including the license to marry, and the marriage certificate shall be prescribed by the State Registrar.*" (Health & Saf. Code, § 103125, italics added.)

The relevant Health and Safety Code statutes also specify that "[t]he county recorder is the local registrar of marriages and shall perform all the duties of the local registrar of marriages" (Health & Saf. Code, § 102285), and that "[e]ach local registrar is hereby charged with the enforcement of this part in his or her registration district *under the supervision and direction of the State Registrar and shall make an immediate report to the State Registrar of any violation of this law coming to his or her knowledge.*" (Health & Saf. Code, § 102295, italics added.) The statutes also provide that "[t]he local registrar of marriages shall carefully examine each certificate before acceptance for registration and, if it is incomplete or unsatisfactory, he or she shall require any further information to be furnished as may be necessary to make the record satisfactory before acceptance for registration." (Health & Saf. Code, § 102310.)

Pursuant to the foregoing provisions, the State Registrar of Vital Statistics (who, as noted, is also the California Director of Health Services) has prescribed a form—Department of Health Services Form VS-117—which serves as the application for license to marry, the license to marry, and the certificate of registry of marriage. One of the principal California family law practice guides describes the relevant portions of the form as follows: "The

---

[14] The Health and Safety Code contains a number of additional provisions that demonstrate the state's overriding interest in the uniform application of the state's marriage laws. (See, e.g., Health & Saf. Code, §§ 102205, 102215.)

first three sections of the form (Groom Personal Data, Bride Personal Data, and Affidavit) constitute the application for license to marry. The personal data sections are filled out by the court clerk, using information and/or documents provided by the applicants. The bride and groom must both sign the application (*see* lines 23 [entitled Signature of Groom], 24 [entitled Signature of Bride]) after the personal data sections have been completed. The fourth section of the form (lines 25A–25F) constitutes the license to marry. This section is to be completed by the clerk." (1 Kirkland et al., Cal. Family Law: Practices and Procedure (2d ed. 2003) Validity of Marriage, Forms, § 10.100[1], p. 10-80, fns. omitted.)

The city acknowledges that the county clerk altered the form prescribed by the State Registrar of Vital Statistics by replacing references to "bride," "groom," and "unmarried man and unmarried woman" with references to "first applicant," "second applicant," and "unmarried individuals," that the county clerk further issued marriage licenses to same-sex couples, and that the county recorder registered certificates of registry of marriage for such couples, despite the knowledge of these officials that the current California statutes do not authorize such actions. The city defends the actions of these officials on the ground that they were based on the belief that the statutory restriction in California law limiting marriage to a man and a woman is unconstitutional. The principal question before us is whether the local officials exceeded or acted outside of their authority in taking these actions.

### III

In light of several questions raised by the briefs filed by the city in this court, we begin with a brief discussion of the respective roles of state and local officials with regard to the enforcement of the marriage statutes (in particular, the issuance of marriage licenses and the registering of marriage certificates), and of the nature of the duties of local officials under the applicable statutes.

### A

As is demonstrated by the above review of the relevant statutory provisions, the Legislature has enacted a comprehensive scheme regulating marriage in California, establishing the substantive standards for eligibility for marriage and setting forth in detail the procedures to be followed and the public officials who are entrusted with carrying out these procedures. In light of both the historical understanding reflected in this statutory scheme and the statutes' repeated emphasis on the importance of having uniform rules and procedures apply throughout the state to the subject of marriage,

there can be no question but that marriage is a matter of "statewide concern" rather than a "municipal affair" (see Cal. Const., art. XI, §§ 4, 5, 6; see, e.g., *California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1, 17 [283 Cal.Rptr. 569, 812 P.2d 916]), and that state statutes dealing with marriage prevail over any conflicting local charter provision, ordinance, or practice.

Furthermore, the relevant statutes also reveal that the only local officials to whom the state has granted authority to act with regard to marriage licenses and marriage certificates are *the county clerk* and *the county recorder*. The statutes do not authorize the mayor of a city (or city and county, as is San Francisco) or any other comparable local official to take any action with regard to the process of issuing marriage licenses or registering marriage certificates. Although a mayor may have authority under a local charter to supervise and control the actions of a county clerk or county recorder with regard to other subjects, a mayor has no authority to expand or vary the authority of a county clerk or county recorder to grant marriage licenses or register marriage certificates under the governing state statutes, or to direct those officials to act in contravention of those statutes. (See, e.g., *Coulter v. Pool* (1921) 187 Cal. 181, 187 [201 P. 120] ["A public officer is a public agent and as such acts only on behalf of his principal . . . . The most general characteristic of a public officer . . . is that a public duty is delegated and entrusted to him, as agent, *the performance of which is an exercise of a part of the governmental functions of the particular political unit for which he, as agent, is acting*" (italics added)]; *Sacramento v. Simmons* (1924) 66 Cal.App. 18, 24–25 [225 P. 36] [when state statute designated local health officers as local registrars of vital statistics, "to the extent [such officials] are discharging such duties they are acting as state officers. *They are state officers performing state functions and are under the exclusive jurisdiction of the state registrar of vital statistics*" (italics added)]; *Boss v. Lewis* (1917) 33 Cal.App. 792, 794 [166 P. 843] [city clerk, when acting as local registrar of vital statistics under state law, is state officer].)

Accordingly, to the extent the mayor purported to "direct" or "instruct" the county clerk and the county recorder to take specific actions with regard to the issuance of marriage licenses or the registering of marriage certificates, we conclude he exceeded the scope of his authority. (See, e.g., *Sacramento v. Simmons, supra,* 66 Cal.App. 18, 24–28.)[15] Furthermore, if the county clerk or the county recorder acted in this case in contravention of the

---

[15] In the mayor's February 10 letter to the county clerk, the mayor simply "request[ed]" the clerk to determine what changes should be made to the forms and documents used to apply for and issue marriage licenses. In the opposition and supplemental opposition filed in this court, however, the city states that the mayor "directed the County Clerk's Office to arrange for the issuance of marriage licenses to same-sex couples" and that "Alfaro was not the decisionmaker with respect to San Francisco's issuance of marriage licenses to same-sex couples. She and the

applicable statutes solely at the behest of the mayor and not on the basis of the official's own determination that the statutes are unconstitutional, such official also would appear to have acted improperly by abdicating the statutory responsibility imposed directly on him or her as a state officer. (See, e.g., *California Radioactive Materials Management Forum v. Department of Health Services* (1993) 15 Cal.App.4th 841, 874 [19 Cal. Rptr. 2d 357], disapproved on another point in *Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 305, fn. 5 [105 Cal.Rptr.2d 636, 20 P.3d 533] ["An executive or administrative officer can no more abdicate responsibility for executing the laws than the Legislature can be permitted to usurp it"].)

■ Although it is not clear that the county clerk and the county recorder acted on the basis of each individual official's own opinion or determination as to the unconstitutionality of the applicable statutes (see fn. 15, *ante*), and the actions of these officials might be vulnerable to challenge on that ground alone, it is nonetheless appropriate in this case to address the question whether a public official may refuse to enforce a statute when he or she determines the statute to be unconstitutional. The city maintains that when, as here, a public official has asserted in a mandate proceeding that a statutory provision that the official has refused to enforce is unconstitutional, a court may not issue a writ of mandate to compel the official to perform a ministerial duty prescribed by the statute unless the court first determines that the statute is constitutional. If, however, the controlling rule of law requires such an official to carry out a ministerial duty dictated by statute unless and until the statute has been judicially determined to be unconstitutional, it follows that such an official cannot *compel* a court to rule on the constitutional issue by refusing to apply the statute and that a writ of mandate properly may issue, without a judicial determination of the statute's constitutionality, directing the official to comply with the statute unless and until the statute has been judicially determined to be unconstitutional. Accordingly, in deciding whether a writ of mandate should issue, it is appropriate to determine whether the city officials were obligated to comply with the ministerial duty prescribed by statute without regard to their view of the constitutionality of the statute.

**B**

■ In addition, we believe it is appropriate to clarify at the outset that, under the statutes reviewed above, the duties of the county clerk and the county recorder at issue in this case properly are characterized as *ministerial* rather than discretionary. When the substantive and procedural requirements

---

other employees within the County Clerk's Office issued marriage licenses to such couples because Mayor Newsom told them to do so."

established by the state marriage statutes are satisfied, the county clerk and the county recorder each has the respective mandatory duty to issue a marriage license and record a certificate of registry of marriage; in that circumstance, the officials have no discretion to withhold a marriage license or refuse to record a marriage certificate. By the same token, when the statutory requirements have not been met, the county clerk and the county recorder are not granted any discretion under the statutes to issue a marriage license or register a certificate of registry of marriage. As we stated recently in *Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 916 [129 Cal.Rptr.2d 811, 62 P.3d 54]: " 'A ministerial act is an act that a public officer is required to perform in a prescribed manner in obedience to the mandate of legal authority and without regard to his own judgment or opinion concerning such act's propriety or impropriety, when a given state of facts exists.' "

Thus, the issue before us is whether under California law the authority of a local executive official, charged with the ministerial duty of enforcing a state statute, includes the authority to disregard the statutory requirements when the official is of the opinion the provision is unconstitutional but there has been no judicial determination of unconstitutionality.

## IV

In the opposition and supplemental opposition filed in this court, the city maintains that a local executive official's general duty and authority to apply the law includes the authority to refuse to apply a statute whenever the official believes it to be unconstitutional, even in the absence of a judicial determination of unconstitutionality and even when the duty prescribed by the statute is ministerial. The city asserts that such authority flows from every public official's duty "to conform [his or her] acts to constitutional norms." The Attorney General argues, by contrast, that it is well established that a duly enacted statute is presumed to be constitutional, and he maintains that "the prospect of local governmental officials unilaterally defying state laws with which they disagree is untenable and inconsistent with the precepts of our legal system."

As we shall explain, we conclude that a local public official, charged with the ministerial duty of enforcing a statute, generally does not have the authority, in the absence of a judicial determination of unconstitutionality, to refuse to enforce the statute on the basis of the official's view that it is unconstitutional.[16]

---

[16] As indicated, the issue presented in this case is purely whether a local official may refuse to apply a statute solely on the basis of the official's view that the statute is unconstitutional.

A

In the initial petitions filed in this matter, petitioners relied primarily on the provisions of article III, section 3.5 of the California Constitution (hereafter generally referred to as article III, section 3.5) in maintaining that the challenged actions of the local officials were improper.

Article III, section 3.5 provides in full: "An administrative agency, including an administrative agency created by the Constitution or an initiative statute, has no power: [¶] (a) To declare a statute unenforceable, or refuse to enforce a statute, on the basis of its being unconstitutional unless an appellate court has made a determination that such statute is unconstitutional. [¶] (b) To declare a statute unconstitutional. [¶] (c) To declare a statute unenforceable, or to refuse to enforce a statute on the basis that federal law or federal regulations prohibit the enforcement of such statute unless an appellate court has made a determination that the enforcement of such statute is prohibited by federal law or federal regulations."

Article III, section 3.5 does not define the term "administrative agency" as used in this constitutional provision. Petitioners maintain that in light of the purpose of the provision, the term "administrative agency" should be interpreted to include local executive officials, particularly local officials who are acting as state officers in carrying out a function prescribed by state statute.

Article III, section 3.5 was proposed by the Legislature and placed before the voters as Proposition 5 at the June 6, 1978 election, and was adopted by the electorate. The ballot argument in favor of Proposition 5, contained in the election brochure distributed to voters prior to the election, stated in part: "Every statute is enacted only after a long and exhaustive process, involving as many as four open legislative committee meetings where members of the public can express their views. If the agencies question the constitutionality of a measure, they can present testimony at the public hearing during legislative consideration. Committee action is followed by full consideration by both houses of the Legislature. [¶] Before the Governor signs or vetoes a bill, he receives analyses from the agencies which will be called upon to implement its provisions. If the Legislature has passed the bill over the objections of the agency, the Governor is not likely to ignore valid apprehensions of his department, as he is Chief Executive of the State and is

---

There is no claim here that the officials acted as they did because of questions regarding the proper interpretation of the applicable statutes or because of doubts as to which of two or more competing statutory provisions to apply. (Cf. *Burlington Northern & Santa Fe Ry. Co. v. Public Utilities Commission* (2003) 112 Cal.App.4th 881, 887–889 [5 Cal.Rptr.3d 503].) Here, the officials acknowledge that the current California statutes limit marriage to a union between a man and a woman, and concede that they refused to apply the relevant statutory provisions solely because of a belief that this statutory requirement is unconstitutional.

responsible for most of its administrative functions. [¶] Once the law has been enacted, however, it does not make sense for an administrative agency to refuse to carry out its legal responsibilities because the agency's members have decided the law is invalid. Yet, administrative agencies are so doing with increasing frequency. These agencies are all part of the Executive Branch of government, charged with the duty of enforcing the law. [¶] The Courts, however, constitute the proper forum for determination of the validity of State statutes. There is no justification for forcing private parties to go to Court in order to require agencies of government to perform the duties they have sworn to perform. [¶] Proposition 5 would prohibit the State agency from refusing to act under such circumstances, unless an appellate court has ruled the statute is invalid. [¶] We urge you to support this Proposition 5 in order to insure that appointed officials do not refuse to carry out their duties by usurping the authority of the Legislature and the Courts. Your passage of Proposition 5 will help preserve the concept of the separation of powers so wisely adopted by our founding fathers." (Ballot Pamp. Primary Elec. (June 6, 1978) argument in favor of Prop. 5, p. 26.) Petitioners maintain that the rationale set forth in this ballot argument applies to local executive officials as well as state administrative agencies, and thus that the term "administrative agency" as used in the provision properly should be construed to apply to local executive officials.

The city vigorously contests petitioners' suggested interpretation of article III, section 3.5, maintaining that this provision is addressed only to state, not local, administrative agencies, and that in any event the local officials here at issue are not an "administrative agency" within the meaning of article III, section 3.5. The city concedes there may be some anomaly in article III, section 3.5's application only to state administrative agencies and not to local executive officials, but insists such an anomaly "would not be license to rewrite Section 3.5 and give it a meaning nobody had in mind when it was passed." The city argues that "[t]he voters were responding to a specific problem [involving state administrative agencies] when they enacted Section 3.5, and they chose specific means to address that problem. In the end, if some in hindsight question the wisdom of that choice, the answer lies in amending California's Constitution, not judicially rewriting it." In sum, the city asserts that the existing terms of article III, section 3.5 cannot properly be interpreted to include local executive officials.

Although one Court of Appeal decision contains language directly supporting petitioners' argument that article III, section 3.5's reference to administrative agencies properly is interpreted to include local executive officials such as county clerks (*Billig v. Voges* (1990) 223 Cal.App.3d 962, 969 [273 Cal.Rptr. 91] (*Billig*)), the city maintains that the question of the proper scope of article III, section 3.5 never was raised in *Billig*, and further that the

pertinent language in *Billig* clearly is dictum. Accordingly, the city argues, the appellate court's decision in *Billig* cannot properly be viewed as resolving the issue whether article III, section 3.5 applies to local officials.[17]

■ As we shall explain, we have determined that we need not (and thus do not) decide in this case whether the actions of the local executive officials here at issue fall within the scope or reach of article III, section 3.5, because

---

[17] In *Billig, supra,* 223 Cal.App.3d 962, the plaintiffs had submitted a referendum petition to the city clerk, but the clerk refused to process the petition or submit it to the city council because the petition did not include the full text of the challenged ordinance, as required by section 4052 of the Elections Code. The plaintiffs then sought a writ of mandate in superior court against the clerk, claiming that this official's authority was limited to determining whether there were sufficient signatures on the petition and did not extend to rejecting a petition for noncompliance with section 4052. The trial court ruled against the plaintiffs and the Court of Appeal affirmed.

The appellate court explained in *Billig* that the city clerk's duty "is limited to the ministerial function of ascertaining whether the *procedural* requirements for submitting a petition have been met" (*Billig, supra,* 223 Cal.App.3d at pp. 968–969), and found that Elections Code section 4052 "involves purely procedural requirements for submitting a referendum petition. Therefore a city clerk who refuses to accept a petition for noncompliance with the statute is only performing a ministerial function involving no exercise of discretion." (*Billig,* at p. 969.)

Stating that the city clerk lacked discretion *not* to enforce the statutory provision, the Court of Appeal discussed article III, section 3.5 and observed: "Administrative agencies, *including public officials in charge of such agencies,* are expressly forbidden from declaring statutes unenforceable, unless an appellate court has determined that a particular statute is unconstitutional. (Cal. Const., art. III, § 3.5.) [Elections Code] [s]ection 4052 has not been declared unconstitutional by an appellate court in this state. Consequently, *the offices of city clerks throughout the state* are mandated by the [C]onstitution to implement and enforce the statute's procedural requirements. In the instant case, respondent had the clear and present ministerial duty to refuse to process appellants' petition because it did not comply with the procedural requirements of section 4052." (*Billig, supra,* 223 Cal.App.3d at p. 969, italics added.)

Although the italicized language in *Billig* supports petitioners' position with regard to the scope of article III, section 3.5, there is no indication that any party in *Billig* raised the argument that article III, section 3.5 applies only to *state* agencies and not to *local* agencies or officials, and thus the court in *Billig* had no occasion to resolve that issue. Moreover, in any event the discussion of article III, section 3.5 in *Billig* clearly was dictum, because an analysis and resolution of the scope of that constitutional provision not only was unnecessary to the decision in *Billig,* but arguably was entirely irrelevant. The plaintiffs in *Billig* had *not* asked the city clerk to refrain from applying Elections Code section 4052 on the ground that the statute was unconstitutional, and the city clerk's decision not to accept the petition did *not* involve consideration of whether he had the authority to determine the provision's constitutionality; moreover, the plaintiffs did not raise any constitutional challenge to section 4052 in the trial court or on appeal. Instead, the plaintiffs in *Billig* simply argued that the applicable provisions of section 4052 did not authorize *a city clerk* (as opposed to a court) to reject a petition for noncompliance with that statute, and that only a court was authorized to disqualify a petition for nonconformance with the requirements of section 4052.

Because the provisions of article III, section 3.5 did not bear on the question before the court in *Billig,* we believe it would be inappropriate to accord much significance to the cited language in that decision.

we conclude that prior to the adoption of article III, section 3.5, it already was established under California law—as in the overwhelming majority of other states (see, *post*, at pp. 1104–1107—that a local executive official, charged with a ministerial duty, generally lacks authority to determine that a statute is unconstitutional and on that basis refuse to apply the statute. Because the adoption of article III, section 3.5 plainly *did not grant or expand* the authority of local executive officials to determine that a statute is unconstitutional and to act in contravention of the statute's terms on the basis of such a determination, we conclude that the city officials do not possess this authority and that the actions challenged in the present case were unauthorized and invalid.

**B**

We begin with a few basic legal principles that were well established prior to the adoption of article III, section 3.5 in 1978.

■ First, one of the fundamental principles of our constitutional system of government is that a statute, once duly enacted, "is presumed to be constitutional. Unconstitutionality must be clearly shown, and doubts will be resolved in favor of its validity." (7 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 58, pp. 102–103 [citing, among numerous other authorities, *In re Madera Irrigation District* (1891) 92 Cal. 296, 308; *San Francisco v. Industrial Acc. Com.* (1920) 183 Cal. 273, 280; *People v. Globe Grain and Mill. Co.* (1930) 211 Cal. 121, 127 [294 P. 3]].)

■ Second, it is equally well established that when, as here, a public official's authority to act in a particular area derives wholly from statute, the scope of that authority is measured by the terms of the governing statute. "It is well settled in this state and elsewhere, that when a statute prescribes the particular method in which a public officer, acting under a special authority, shall perform his duties, the mode is the measure of the power." (*Cowell v. Martin* (1872) 43 Cal. 605, 613–614; see, e.g., *County of Alpine v. County of Tuolumne* (1958) 49 Cal.2d 787, 797 [322 P.2d 449]; *California State Restaurant Assn. v. Whitlow* (1976) 58 Cal.App.3d 340, 346–347 [129 Cal.Rptr. 824] ["[a]dministrative bodies and officers have only such powers as have expressly or impliedly been conferred upon them by the Constitution or by statute"].)

The city has not identified any provision in the California Constitution or in the applicable statutes that purports to grant the county clerk or the county recorder (or any other local official) the authority to determine the constitutionality of the statutes each public official has a ministerial duty to enforce. Instead, the city's position appears to be that a public executive official's duty

to follow the law (including the Constitution) includes the implied or inherent authority to refuse to follow an applicable statute whenever the official personally believes the statute to be unconstitutional, even though there has been no judicial determination of the statute's unconstitutionality and despite the existence of the rule that a duly enacted statute is presumed to be constitutional.

As we shall see, the California authorities that were in place prior to the adoption of article III, section 3.5, do not support the city's position.

## C

Although in this case we need not determine the scope of article III, section 3.5, the historical background that led to the proposal and adoption of that constitutional provision in 1978 nonetheless provides a useful starting point for our analysis. As this court explained in *Reese v. Kizer* (1988) 46 Cal.3d 996, 1002 [251 Cal.Rptr. 299, 760 P.2d 495], "[a]rticle III, section 3.5, . . . was placed on the ballot by a unanimous vote of the Legislature in apparent response to this court's decision in *Southern Pac. Transportation v. Public Utilities Com.* (1976) 18 Cal.3d 308 [134 Cal.Rptr. 189] [hereafter *Southern Pacific*], in which the majority held that the Public Utilities Commission had the power to declare a state statute unconstitutional." Accordingly, the decision in *Southern Pacific* is an appropriate place to begin.

In *Southern Pacific*, the plaintiff railroad company sought review of two decisions of the Public Utilities Commission (PUC) in which the PUC held that section 1202.3 of the Public Utilities Code, a statute enacted in 1971, was unconstitutional. Section 1202.3 was one of a number of statutes in the Public Utilities Code dealing with railroad crossings. With respect to private or farm railroad crossings, Public Utilities Code section 7537 (1) granted "the owner of adjoining lands the right to *private* or *farm* crossings necessary or convenient for egress or ingress" (*Southern Pacific, supra,* 18 Cal.3d at p. 311), (2) provided that the railroad must maintain the crossings, and (3) granted the PUC the authority to fix and assess the cost of such crossings. With respect to railroad crossings on *public* or *publicly used roads*, Public Utilities Code section 1202 gave the PUC the exclusive power "to regulate *public* or *publicly used* road or highway crossings, including locating, maintaining, protecting, and closing them" (*Southern Pacific, supra,* 18 Cal.3d at p. 312), and further granted the PUC the authority to allocate costs among the railroad and the affected public entities responsible for maintaining the public or publicly used road, including any costs involved in closing a crossing.

Public Utilities Code section 1202.3, the statute at issue in *Southern Pacific*, provided, in turn, that in any proceeding under Public Utilities Code

section 1202 "involving a *publicly used* road or highway not on a publicly maintained road system," the PUC could apportion costs to the public entity if the PUC found "(a) express dedication and acceptance of the road or (b) a judicial determination of implied dedication." (*Southern Pacific, supra,* 18 Cal.3d at p. 312.) If neither condition was found, section 1202.3 provided that the PUC "shall order the crossing abolished by physical closing." Section 1202.3 further provided that "the railroad shall in no event be required to bear improvement costs 'in excess of what it would be required to bear in connection with the improvement of a public street or highway crossing.' " (*Southern Pacific, supra,* 18 Cal.3d at pp. 312–313.)

In *Southern Pacific*, the PUC concluded in an administrative proceeding that Public Utilities Code section 1202.3 was unconstitutional because it unlawfully delegated the state's police power to private litigants by granting private litigants absolute discretion to require the closing of a railroad crossing merely by commencing a proceeding under Public Utilities Code section 1202. The PUC's conclusion was based in part on its determination that under section 1202.3, once the PUC found that there had been neither an express dedication and acceptance of the publicly used road, nor a judicial determination of an implied dedication of the road, the PUC had no alternative but to order the crossing closed and to require the railroad to pay for the closing. (*Southern Pacific, supra,* 18 Cal.3d at p. 313.)

On review, this court unanimously disagreed with the PUC's constitutional determination. Observing that Public Utilities Code section 1202.3 provided, in its introductory phrase, that the statute applied "in any proceeding under Section 1202," the court in *Southern Pacific* reasoned that "the Legislature has declared that section 1202.3 is an exception to the former section and that the provisions for cost allocation and closing crossings in the latter section *are only applicable when the commission would otherwise have ordered improvement of a crossing pursuant to the former section.* The standard for compelling crossing improvement implicit in section 1202 is obviously public convenience and necessity, including safety concerns [citations], and this standard must be read into section 1202.3. [¶] Thus, before the commission may close a crossing under section 1202.3, it must not only find public use and lack of requisite dedication, but also find that necessity and convenience preclude continued use of the crossing in its existing condition. Such findings—rather than mere commencement of a proceeding under section 1202—[are] the basis for closing a crossing under section 1202.3. [¶] The function of the private litigant within the statutory framework is merely to call the commission's attention to the need for improving or closing a crossing and perhaps to urge action on the commission." (*Southern Pacific, supra,* 18 Cal.3d at p. 314, italics added.)

As noted, in *Southern Pacific* all of the justices of this court agreed that the PUC had erred in concluding that Public Utilities Code section 1202.3 was unconstitutional. Although the briefs filed in this court in *Southern Pacific* did not raise any question regarding the authority of the PUC to determine the constitutionality of section 1202.3,[18] and the majority in *Southern Pacific* did not address that question in the text of the opinion, Justice Mosk authored a vigorous concurring and dissenting opinion in *Southern Pacific*, arguing strongly that neither the PUC nor any other administrative agency "may declare a duly enacted statute unconstitutional," and that "it is incongruous for the will of the people of the state, reflected by their elected legislators, to be thwarted by a governmental body which exists only to implement that will." (*Southern Pacific, supra,* 18 Cal.3d at p. 315 (conc. & dis. opn. of Mosk, J.).)

Justice Mosk's concurring and dissenting opinion in *Southern Pacific* acknowledged that a prior California decision—*Walker v. Munro* (1960) 178 Cal.App.2d 67 [2 Cal.Rptr. 737] (hereafter *Walker*)—had held that an administrative agency that has been granted judicial or quasi-judicial power by the California Constitution (a type of entity commonly referred to as a "constitutional agency")[19] has the authority to consider the constitutionality of a statute in the course of its quasi-judicial proceedings. Justice Mosk suggested, however, that *Walker* had been "indirectly criticized and implicitly disapproved" (*Southern Pacific, supra,* 18 Cal.3d at p. 316 (conc. & dis. opn. of Mosk, J.)) in *State of California v. Superior Court* (1974) 12 Cal.3d 237, 250–251 [115 Cal.Rptr. 497, 524 P.2d 1281] (hereafter *State of California v. Superior Court (Veta)*), and he took issue with "the debatable premise that any and all 'judicial power' inherently entails the authority to declare a law unconstitutional." (*Southern Pacific, supra,* 18 Cal.3d at p. 317.) Relying upon language in numerous decisions of the United States Supreme Court indicating that an administrative agency or executive official has no power to adjudicate constitutional issues (*id.* at p. 316), and decisions from other jurisdictions holding "that administrative agencies lack the powers appropriated in this case" (*ibid.*), Justice Mosk concluded that the extensive powers granted by the California Constitution to the PUC did not include the power to declare a statute unconstitutional and to refuse to apply it.

---

[18] Indeed, in the petition filed in this court, the petitioner in *Southern Pacific* expressly stated that it did "not question the authority of the Commission, which has quasi judicial powers and is a court of special jurisdiction, to declare and hold a statute to be unconstitutional."

[19] See, e.g., *Brice v. Dept. of Alcoholic Bev. Control* (1957) 153 Cal.App.2d 315, 320 [314 P.2d 807] ("[The Department of Alcoholic Beverage Control] is a constitutional agency that has succeeded to some of the powers of the State Board of Equalization in alcoholic beverage control matters. Being an agency upon which the Constitution has conferred limited judicial powers, its decisions on factual matters must be affirmed if there is substantial evidence to support them").

The majority in *Southern Pacific* responded to Justice Mosk's concurring and dissenting opinion in a lengthy footnote. (See *Southern Pacific, supra,* 18 Cal.3d 308, 311–312, fn. 2.) The initial portion of the footnote contains some broad language that could be read to support the conclusion that the duty of any administrative agency or public official to obey the Constitution affords such agency or official the authority to determine the constitutional validity of statutes the agency or official is charged with enforcing. The majority in *Southern Pacific,* however, ultimately rested its holding that the PUC had the authority to determine the constitutional validity of statutes on the circumstance that the California Constitution grants broad judicial or quasi-judicial power to the PUC.

The majority in *Southern Pacific* stated in this regard: "[T]he Constitution and statutes of this state grant the commission wide administrative, legislative, and judicial powers. [Citations.] The Legislature has limited the judiciary from interfering with the commission by restricting review to the Supreme Court and by additionally restricting review to determining 'whether the commission has regularly pursued its authority, *including* a determination of whether the order or decision under review violates any right of the petitioner under the Constitution of the United States or of this State.' (Italics added; [citations].) Public Utilities Code section 1732 provides corporations and individuals may not raise matters in any court not presented to the commission on petition for rehearing, reflecting, when read with the judicial review sections, legislative determination that all issues must be presented to the commission. *Under the broad powers granted it, the commission may determine the validity of statutes.*" (*Southern Pacific, supra,* 18 Cal.3d at pp. 311–312, fn. 2, italics added.)

This review of the decision in *Southern Pacific* demonstrates that there was a significant disagreement in this court on the particular question *whether a so-called constitutional agency* (like the PUC), *that has been granted the authority to exercise quasi-judicial power by the California Constitution,* has the authority to determine that a statute the agency is called upon to apply is unconstitutional and need not be followed. We are unaware, however, of any case, either prior to or subsequent to *Southern Pacific,* that suggests that under the California Constitution *a local executive official such as a county clerk,* who is charged with the *ministerial* duty to enforce a statute, has the authority to exercise judicial power by determining whether a statute is unconstitutional.

The case of *Walker, supra,* 178 Cal.App.2d 67, cited (and criticized) in Justice Mosk's concurring and dissenting opinion in *Southern Pacific,* appears to be the first case in California to address the question whether an administrative agency has the authority to determine the constitutionality of a

statute that the agency is required to enforce. In *Walker*, the plaintiffs were retail liquor dealers who had been charged in an administrative proceeding before the Department of Alcoholic Beverage Control with violating the fair trade provisions of the California Alcoholic Beverage Control Act. While the administrative proceeding was pending, the plaintiffs filed a declaratory judgment action in superior court against the administrative officials, seeking a declaration that the fair trade provisions of the Alcoholic Beverage Control Act were unconstitutional, and an order enjoining the officials from enforcing those provisions. The trial court in *Walker* granted summary judgment in favor of the defendants, relying upon the circumstance that the same constitutional issue had been raised in the pending administrative proceeding and upon the trial court's conclusion "that it is more expeditious and proper that the Department rule on the question before the court is required to rule on it." (178 Cal.App.2d at p. 70.)

On appeal, the plaintiffs argued that the exhaustion of remedies doctrine upon which the trial court had relied was inapplicable, because the Department of Alcoholic Beverage Control "does not have the power . . . to decide constitutional questions." (*Walker, supra,* 178 Cal.App.2d at p. 73.) In rejecting this contention, the Court of Appeal in *Walker* began by referring to the applicable provision of the California Constitution that empowers the Alcoholic Beverage Control Appeals Board to review questions " 'whether the department has proceeded without or in excess of its jurisdiction, whether the department has proceeded in the manner required by law, whether the decision is supported by the findings, and whether the findings are supported by substantial evidence in light of the whole record.' (Cal. Const., art. XX, § 22.)" (178 Cal.App.2d at p. 73.) The court in *Walker* then observed: "The department and the Appeals Board are thus constitutional agencies *upon which limited judicial powers have been conferred.* [Citations.]" (*Ibid.*, italics added.)

In response to the plaintiffs' claim in *Walker* that the department only could make findings of fact and that the appeals board only was empowered "to review certain questions of law, which are only procedural" (*Walker, supra,* 178 Cal.App.2d at p. 74), the court in *Walker* stated: "However, there does not appear to be any basis for so limiting the grant of power to the Appeals Board. The Appeals Board may determine whether the department acted within its jurisdiction. In *United Insurance Co. v. Maloney* [(1954)] 127 Cal.App.2d [155,] 157 [273 P.2d 579], the court stated: 'A charge of unconstitutional action goes to the very jurisdiction of the administrative officer or body to entertain the proceeding . . . .' [Citation.] This would also seem applicable to a charge that the statute which the agency is seeking to enforce is unconstitutional." (*Walker, supra,* 178 Cal.App.2d at p. 74.)

Accordingly, in concluding that the administrative agency in that case had the authority to determine, at least in the first instance, the question whether the fair trade statutes were unconstitutional, the court in *Walker* specifically relied upon the circumstance that the Alcoholic Beverage Control Appeals Board had been granted the authority by the California Constitution to exercise limited judicial power.[20]

As noted in Justice Mosk's concurring and dissenting opinion in *Southern Pacific*, this court held in *State of California v. Superior Court (Veta), supra,* 12 Cal.3d 237, some years after the appellate court's decision in *Walker*, that a plaintiff seeking a declaration that the California Coastal Zone Conservation Act of 1972 was unconstitutional was not required to pursue that constitutional claim before the Coastal Zone Conservation Commission prior to bringing a court action. (12 Cal.3d at pp. 250–251.) Although there is some language in *Veta* critical of *Walker*, the two cases nonetheless are clearly and easily distinguishable, because the Coastal Zone Conservation Commission, unlike the Alcoholic Beverage Control Appeals Board, had not been granted any judicial power by the California Constitution. Thus, the holding in *State of California v. Superior Court (Veta)* that the commission lacked authority to pass on the constitutionality of the statute establishing its status and functions was not inconsistent with the *Walker* decision.

 In light of the foregoing review of the relevant case law, we believe that after this court's decision in *Southern Pacific, supra,* 18 Cal.3d 308, the state of the law in this area was clear: administrative agencies that had been granted judicial or quasi-judicial power by the California Constitution possessed the authority, in the exercise of their administrative functions, to determine the constitutionality of statutes, but agencies that had not been granted such power under the California Constitution lacked such authority. (See *Hand v. Board of Examiners in Veterinary Medicine* (1977) 66 Cal.App.3d 605, 617–619 [136 Cal.Rptr. 187].) Accordingly, these decisions recognize that, under

---

[20] The significance attached by the court in *Walker* to the California Constitution's grant of judicial power to the Alcoholic Beverage Control Appeals Board is confirmed by the distinction the *Walker* decision drew between the case before it and a then recent decision of the California Supreme Court that was heavily relied upon by the plaintiffs. The court in *Walker* explained: *"County of Alpine v. County of Tuolumne* (1958) 49 Cal.2d 787 [322 P.2d 449], referred to extensively by plaintiffs, is not in point. There the county of Alpine brought an action to determine its boundaries with defendant counties. Judgment of dismissal was reversed. Defendants asserted that the county of Alpine had not exhausted an administrative remedy before the State Lands Commission. But the court held that the agency [the State Lands Commission] was empowered only to 'survey and mark' boundaries. . . . *[I]t was without jurisdiction to make judicial determinations* of boundaries and therefore the county of Alpine could properly maintain its action." (*Walker, supra,* 178 Cal.App.2d at p. 73, italics added.)

California law, the determination whether a statute is unconstitutional and need not be obeyed is an exercise of judicial power and thus is reserved to those officials or entities that have been granted such power by the California Constitution.[21]

Given the foregoing decisions and their reasoning, it appears evident that under California law as it existed prior to the adoption of article III, section 3.5 of the California Constitution, *a local executive official*, such as a county clerk or county recorder, possessed no authority to determine the constitutionality of a statute that the official had a ministerial duty to enforce. If, in the absence of a grant of judicial authority from the California Constitution, an administrative agency that was required by law to reach its decisions only after conducting court-like quasi-judicial proceedings did not generally possess the authority to pass on the constitutionality of a statute that the agency was required to enforce, it follows even more so that a local executive official who is charged simply with the ministerial duty of enforcing a statute, and who generally acts without any quasi-judicial authority or procedure whatsoever, did not possess such authority. As indicated above, we are unaware of any California case that suggests such a public official has been granted judicial or quasi-judicial power by the California Constitution.[22]

■ The city, in arguing that article III, section 3.5 does not apply to local officials, relies upon the statement in *Strumsky v. San Diego County Employees Ret. Assn.* (1974) 11 Cal.3d 28, 36 [112 Cal.Rptr. 805], that the separation of powers clause in article III "is inapplicable to the government below the state level."[23] The city might well argue that this language in *Strumsky* also renders inapposite the line of California cases (*Southern*

---

[21] In this regard it is worth noting that article III, section 3 of the California Constitution explicitly provides: "The powers of State government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others *except as permitted by this Constitution*." (Italics added.)

[22] The city, in a footnote contained in its reply brief to several amicus curiae briefs, maintains that the actions of its officials did not constitute the exercise of judicial powers, citing a brief passage in this court's decision in *Lusardi Constr. Co. v. Aubry* (1992) 1 Cal.4th 976, 993 [4 Cal.Rptr.2d 837, 824 P.2d 643] (*Lusardi*) (the Director of the Department of Industrial Relations' "determination that a project is a public work . . . cannot be accurately characterized as 'judicial,' because it does not encompass the conduct of a hearing or a binding order for any type of relief"). In *Lusardi*, however, the director, unlike the city officials here, acted to enforce a statutory provision; he did not defy or disregard a statutory provision on the basis of his own determination that the statute was unconstitutional. *Lusardi* clearly provides no support for the city's position.

[23] The statement in numerous California decisions that the separation of powers provision of article III is inapplicable to government below the state level means simply that, in establishing a governmental structure for the purpose of managing municipal affairs, the Legislature (through statutes) or local entities (through charter provisions and the like) may combine executive, legislative, and judicial functions in a manner different from the structure that the California Constitution prescribes for state government. (See, e.g., *Wulzen v. Board of*

*Pacific, supra,* 18 Cal.3d 308; *State of California v. Superior Court (Veta), supra,* 12 Cal.3d 237; and *Walker, supra,* 178 Cal.App.2d 67) that we have just discussed. The city fails to recognize, however, that the decision in *Strumsky* emphatically did *not* hold that under the California Constitution local executive officials are free to exercise judicial power. On the contrary, in *Strumsky* this court expressly *overruled* a line of earlier California decisions that had held (for purposes of determining the appropriate standard of judicial review of a decision of a local administrative agency) that such an agency could exercise judicial power; the opinion in *Strumsky* concluded instead that a local administrative agency has *no* authority under the California Constitution to exercise judicial power. (*Strumsky, supra,* 11 Cal.3d at pp. 36–44.) In light of this holding in *Strumsky*, it appears clear that a local executive official who makes decisions—without the benefit of even a quasi-judicial proceeding—has no authority to exercise judicial power, such as by determining the constitutionality of applicable statutory provisions.

Accordingly, we conclude that at the time article III, section 3.5 was adopted, it was clear under California law that a local executive official did not have the authority to determine that a statute is unconstitutional or to refuse to enforce a statute in the absence of a judicial determination that the statute is unconstitutional.[24]

The adoption of article III, section 3.5, of course, effectively overruled the majority's holding in *Southern Pacific* and largely embraced the reasoning set forth in Justice Mosk's concurring and dissenting opinion, amending the California Constitution to provide that "[a]n administrative agency, *including an administrative agency created by the Constitution or an initiative statute, has no power . . . [t]o . . .* refuse to enforce a statute on the basis of its being unconstitutional unless an appellate court has made a determination that such

---

*Supervisors* (1894) 101 Cal. 15, 25–26 [35 P. 353]; *People v. Provines* (1868) 34 Cal. 520, 532–540.) As explained hereafter, the statement does *not* mean that a local executive official has the inherent authority to exercise judicial power.

[24] In a somewhat related context, this court held in *Farley v. Healey* (1967) 67 Cal.2d 325 [62 Cal.Rptr. 26, 431 P.2d 650] that an acting registrar of voters, who refused to determine whether sufficient signatures had been submitted to qualify a local initiative measure for the ballot because of his conclusion that the content of the initiative was not a proper subject for a local initiative, "exceeded his authority in undertaking to determine whether the proposed initiative was within the power of the electorate to adopt." (67 Cal.2d at p. 327.) We explained that under the applicable charter provision, the registrar's "duty is limited to the ministerial function of ascertaining whether the procedural requirements for submitting an initiative measure have been met. *It is not his function to determine whether a proposed initiative will be valid if enacted or whether a proposed declaration of policy is one to which the initiative may apply. These questions may involve difficult legal issues that only a court can determine. . . .* Given compliance with the formal requirements for submitting an initiative, the registrar must place it on the ballot unless he is directed to do otherwise by a court on a compelling showing that a proper case has been established for interfering with the initiative power." (*Ibid.,* italics added.)

statute is unconstitutional." (Italics added.) As we already have noted, we need not and do not decide in this case what effect the adoption of article III, section 3.5 has on the authority of local executive officials, because it is abundantly clear that this constitutional amendment did not *expand* the authority of such officials so as to permit them to refuse to enforce a statute solely on the basis of their view that the statute is unconstitutional. Accordingly, we conclude that under California law a local executive official generally lacks such authority.

## D

 In support of its contrary claim that, as a general matter, California law long has recognized that an executive public official has the authority to refuse to comply with a ministerial statutory duty whenever the official personally believes the statute is unconstitutional, the city relies upon a line of California decisions that have reviewed the validity of statutes or ordinances authorizing the issuance of bonds, the letting of public contracts, or the disbursement of public funds in mandate actions filed against public officials who refused to comply with a ministerial duty. As the city accurately notes, numerous California decisions addressing these three subjects have held that "mandate is the proper remedy to compel a public officer to perform ministerial acts such as issuance of bonds [and that] the constitutionality of the law authorizing a bond issuance may be determined in a proceeding for such a writ." (*California Housing Finance Agency v. Elliott* (1976) 17 Cal.3d 575, 579–580 [131 Cal.Rptr. 361, 551 P.2d 1193] [bond]; see, e.g., *California Educational Facilities Authority v. Priest* (1974) 12 Cal.3d 593, 598 [116 Cal.Rptr. 361, 526 P.2d 513] [bond]; *Metropolitan Water District v. Marquardt* (1963) 59 Cal.2d 159, 170–171 [28 Cal.Rptr. 724, 379 P.2d 28] [public contract]; *City of Whittier v. Dixon* (1944) 24 Cal.2d 664, 666 [151 P.2d 5] [warrant]; *Golden Gate Bridge etc. Dist. v. Felt* (1931) 214 Cal. 308, 315–320 [5 P.2d 585] [bond]; *Los Angeles Co. F.C. Dist. v. Hamilton* (1917) 177 Cal. 119, 121 [169 P. 1028] [bond]; *Denman v. Broderick* (1896) 111 Cal. 96, 99, 105 [43 P. 516] [warrant].)

In each of the foregoing cases, the mandate action was instituted after a public official who was under a statutory duty to perform a ministerial act that was a necessary step in the issuance of the bond, the letting of the contract, or the disbursement of public funds (such as affixing the official's signature to the bond or contract, or issuing a warrant) refused to perform that act based upon the official's ostensible doubts as to the constitutional validity of the statute authorizing the bond, contract, or public expenditure. The city emphasizes that in none of these cases did the court criticize such a public official for declining to perform his or her ministerial act, but instead concluded that the public official's refusal to act was an appropriate means of

bringing the constitutional question of the validity of the bond, contract, or expenditure of public funds before the court for resolution. The city maintains that these decisions demonstrate that the general rule in California always has been that *every* public official is free to determine the constitutional validity of the statutory provisions that he or she has a ministerial duty to enforce or execute, and free to refuse to perform the ministerial act if he or she in good faith believes the statute to be unconstitutional. The city argues that the line of decisions we have analyzed above—holding, prior to the adoption of article III, section 3.5, that only administrative agencies constitutionally authorized to exercise judicial power have the authority to determine the constitutional validity of statutes—involved *a limited exception* applicable only to administrative agencies.

We believe the city's argument misconceives the state of the law prior to the adoption of article III, section 3.5. As we have discussed above, the general rule established by California decisions at the time *Southern Pacific, supra,* 18 Cal.3d 308, was decided was that, among administrative agencies, only one that had been granted judicial power under the California Constitution possessed the authority to determine the constitutionality of a statute it was charged with enforcing and to decline to apply the statute if the agency determined it was unconstitutional. As already explained, if a nonconstitutional administrative agency that rendered its decisions after an extensive quasi-judicial procedure—in which the arguments for and against constitutionality could be fully presented and considered in a quasi-judicial fashion—lacked authority to determine constitutional issues, it clearly would be anomalous to permit an ordinary executive official (who carries out his or her official action without the benefit of any sort of quasi-judicial procedures) to determine the constitutionality of a statute and to refuse to apply it based simply upon the official's own good faith belief that the statute is unconstitutional. Thus, the general rule in California—and, as we shall discuss below, in most jurisdictions—was (and continues to be) that an executive official does not possess such authority.

It is the line of public finance cases upon which the city relies that involves the exceptional situation. As the applicable decisions make clear, the public official in each of those cases was permitted to refuse to perform a ministerial act when he or she had doubts about the validity of the underlying bond, contract, or public expenditure, both in order to ensure that a mechanism was available for obtaining a timely *judicial* determination of the validity of the bond issue, contract, or public expenditure—a determination often essential to the marketability of bonds or to the contracting parties' willingness to go forward with the contract (see, e.g., *Golden Gate Bridge etc. Dist. v. Felt,*

*supra,* 214 Cal. 308, 315), or to avoid irreparable loss of public funds[25]—and in recognition of the circumstance that, in this specific context, the public official frequently faced potential *personal* liability (as distinguished from the potential liability of a governmental entity) if the bond, contract, or public expenditure ultimately was found to be invalid. (See, e.g., *Golden Gate Bridge etc. Dist. v. Felt, supra,* 214 Cal. at pp. 316–317; *Denman v. Broderick, supra,* 111 Cal. 96, 105.)

■ Although the city points to language in some of these decisions that could be read to support the city's broad position here, the *holdings* in these cases clearly are limited to a public official's ability to refuse to perform a ministerial act necessary for the execution of a bond issue or public contract, or the disbursement of public funds, where such refusal permits a judicial determination prior to the actual sale of the bonds, the carrying out of the contract, or the disbursement of public funds, and where the official's personal liability frequently is at stake. Contrary to the city's contention, the circumstance that a public official may refuse to perform a ministerial act in that context does not signify that in all other contexts every public official is free to refuse to perform a ministerial act based upon the official's view that the statute the officer is statutorily obligated to apply is unconstitutional.

The city attempts to bring the present matter within the reach of the foregoing cases by arguing that if the city officials enforced California's current marriage laws limiting marriage to a man and a woman, the officials would face possible personal liability for monetary damages under state or federal law if the marriage statutes subsequently were determined to be unconstitutional. The city's argument in this regard clearly lacks merit.

■ First, as a matter of state law, Government Code section 820.6 explicitly provides that "[i]f a public employee acts in good faith, without malice, and under the apparent authority of an enactment that is unconstitutional, invalid or inapplicable, he is not liable for an injury caused thereby except to the extent that he would have been liable had the enactment been constitutional, valid and applicable." Thus, the officials clearly would not have incurred liability under California law simply for following the current marriage statutes and declining to issue marriage licenses or register marriage certificates in contravention of those statutes. ■ Second, under federal

---

[25] The public finance cases upon which the city relies generally preceded the adoption of California's validation statutes, which currently permit a public agency to file an in rem action in order to obtain a judicial determination of the validity of bonds, warrants, contracts, obligations, or similar evidences of indebtedness. (See Code Civ. Proc., § 860 et seq. [initially adopted in 1961 (Stats. 1961, ch. 1479, § 1, p. 3331)].) The current statutes provide that such actions "shall be given preference over all other civil actions . . . to the end that such actions shall be speedily heard and determined." (Code Civ. Proc., § 867.)

law, a local public official generally is immunized from liability for official acts so long as the official's conduct "does not violate *clearly established* statutory or constitutional rights of which a reasonable person would have known" (*Harlow v. Fitzgerald* (1982) 457 U.S. 800, 818 [73 L.Ed.2d 396, 102 S.Ct. 2727], italics added; see *Anderson v. Creighton* (1987) 483 U.S. 635, 639 [97 L.Ed.2d 523, 107 S.Ct. 3034]), and, as we discuss below (see, *post*, pp. 1102–1104), in this instance there simply is no plausible argument that the city officials would have violated "clearly established" constitutional rights by continuing to enforce California's current marriage statutes in the absence of a judicial determination that the statutes are unconstitutional. (Cf. *LSO, Ltd. v. Stroh* (9th Cir. 2000) 205 F.3d 1146, 1160 [finding state officials were not entitled to qualified immunity when "no reasonable official could have believed" that application of the statute at issue was constitutional in light of prior controlling judicial decisions].) Finally, even if the city officials were to be sued in their personal capacity for actions taken pursuant to statute and in the scope of their employment, under Government Code section 825 the officials would be entitled to have their public employer provide a defense and pay any judgment entered in such an action, whether the action was based on a state law claim or a claim under the federal civil rights statutes. (See *Williams v. Horvath* (1976) 16 Cal.3d 834, 842–848 [129 Cal.Rptr. 453, 548 P.2d 1125].) Accordingly, there is no merit to the city's contention that the actions of the city officials that are challenged here can be defended as necessary to avoid the incurring of personal liability on the part of such officials.

## E

Some academic commentators, while confirming that as a general rule executive officials must comply with duly enacted statutes even when the officials believe the provisions are unconstitutional, have suggested that there may be room to recognize an exception to this general rule in instances in which a public official's refusal to apply the statute would provide the most practical or reasonable means of enabling the question of the statute's constitutionality to be brought before a court. (See, e.g., May, *Presidential Defiance of "Unconstitutional" Laws: Reviving the Royal Prerogative* (1994) 21 Hastings Const. L.Q. 865, 994–996.)[26] As we have just seen, the line of public finance cases relied upon by the city may be viewed as an example of

---

[26] A number of law review articles suggest that the federal Constitution should be interpreted as permitting the President of the United States to refuse to enforce a statute that the President believes is unconstitutional. (See, e.g., Easterbrook, *Presidential Review* (1990) 40 Case W. Res. L.Rev. 905.) Other scholars, however, have made a strong argument that the history of the proceedings of the constitutional convention that drafted the federal Constitution, and in particular the Founders' explicit rejection of a proposal for an absolute presidential veto, refutes such an interpretation. (See, e.g., May, *Presidential Defiance of 'Unconstitutional' Laws: Reviving the Royal Prerogative, supra*, 21 Hastings Const. L.Q. 865, 872–895.) To date,

just such a limited exception, and there are a number of other California decisions in which a constitutional challenge to a statute or other legislative enactment has been brought before a court for judicial resolution by virtue of a public entity's refusal to comply with the statute, under circumstances in which the public entity had a personal stake or interest in the constitutional issue and the public entity's action was the most practicable or reasonable method of obtaining a judicial determination of the validity of the statute. (See, e.g., *County of Riverside v. Superior Court* (2003) 30 Cal.4th 278 [132 Cal.Rptr.2d 713, 66 P.3d 718] [impingement on county's home rule authority]; *Star-Kist Foods, Inc. v. County of Los Angeles* (1986) 42 Cal.3d 1, 5–10 [227 Cal.Rptr. 391, 719 P.2d 987] [impingement on county's taxing authority].)

■ Although it may be appropriate in some circumstances for a public entity or public official to refuse or decline to enforce a statute as a means of bringing the constitutionality of the statute before a court for judicial resolution, it is nonetheless clear that such an exception does not justify the actions of the local officials at issue in the present case. Here, there existed a clear and readily available means, other than the officials' wholesale defiance of the applicable statutes, to ensure that the constitutionality of the current marriage statutes would be decided by a court. If the local officials charged with the ministerial duty of issuing marriage licenses and registering marriage certificates believed the state's current marriage statutes are unconstitutional and should be tested in court, they could have denied a same-sex couple's request for a marriage license and advised the couple to challenge the denial in superior court. *That* procedure—a lawsuit brought by a couple who has been denied a license under existing statutes—is the procedure that was utilized to challenge the constitutionality of California's antimiscegenation statute in *Perez v. Sharp* (1948) 32 Cal.2d 711 [198 P.2d 17], and the procedure apparently utilized in all of the other same-sex marriage cases that have been litigated recently in other states. (See, e.g., *Baehr v. Lewin* (1993) 74 Haw. 530 [852 P.2d 44]; *Goodridge v. Department of Pub. Health* (2003) 440 Mass. 309 [798 N.E.2d 941]; *Baker v. State of Vermont* (1999) 170 Vt. 194 [744 A.2d 864].) The city cannot plausibly claim that the desire to obtain a judicial ruling on the constitutional issue justified the wholesale defiance of the applicable statutes that occurred here.[27]

no court has accepted the contention that the President possesses such authority. (See, e.g., *Ameron, Inc. v. U.S. Army Corp. of Eng'rs* (3d Cir. 1986) 787 F.2d 875, 889 & fn. 11 ["This claim of right for the President to *declare* statutes unconstitutional and to declare his refusal to execute them, as distinguished from his undisputed right to veto, criticize, or even refuse to defend in court, statutes which he regards as unconstitutional, is dubious at best"].)

[27] As noted above, after several mandate actions were filed against the city in superior court challenging the actions of the city officials, the city filed a cross-complaint in one of the actions, seeking a declaratory judgment that the marriage statutes are unconstitutional insofar as they limit marriage to a union between a man and a woman. (See, *ante*, p. 1071, fn. 6.) We

Accordingly, the city cannot defend the challenged actions on the ground that such actions were necessary to obtain a judicial determination of the constitutionality of California's marriage statutes.

**F**

The city also relies on the circumstance that each of the city officials in question took an oath of office to "support and defend" the state and federal Constitutions,[28] suggesting that a public official would violate his or her oath of office were the official to perform a ministerial act under a statute that the official personally believes violates the Constitution. In our view, this contention clearly lacks merit.

 As Justice Mosk explained in his concurring and dissenting opinion in *Southern Pacific, supra,* 18 Cal.3d 308, 319, a public official "faithfully upholds the Constitution by complying with the mandates of the Legislature, leaving to courts the decision whether those mandates are invalid." A public official does not honor his or her oath to defend the Constitution by taking action in contravention of the restrictions of his or her office or authority and justifying such action by reference to his or her personal constitutional views. For example, it is clear that a justice of this court or of an intermediate appellate court does not act in contravention of his or her oath of office when the justice follows a controlling constitutional decision of a higher court even though the justice personally believes that the controlling decision was wrongly decided and that the Constitution actually requires the opposite result. On the contrary, the oath to support and defend the Constitution requires a public official to act within the constraints of our constitutional system, not to disregard presumptively valid statutes and take action in violation of such statutes on the basis of the official's own

---

have no occasion in this case to determine whether the city properly could maintain a declaratory judgment action in this setting, but we note that in another context the Legislature specifically has authorized a public official who questions the constitutionality or validity of an enactment to bring a declaratory judgment action rather than act in contravention of the statute. (See Rev. & Tax. Code, § 538; see also *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 79–80 [124 Cal.Rptr.2d 519, 52 P.3d 695].)

[28] Article XX, section 3 of the California Constitution provides in relevant part: "Members of the Legislature, and all public officers and employees, executive, legislative, and judicial, except such inferior officers and employees as may be by law exempted, shall, before they enter upon the duties of their respective offices, take and subscribe the following oath or affirmation: [¶] 'I, _____, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States and the Constitution of the State of California against all enemies, foreign and domestic; that I will bear true faith and allegiance to the Constitution of the United States and the Constitution of the State of California; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties upon which I am about to enter.' "

determination of what the Constitution means.[29] (See also *State v. State Board of Equalizers* (Fla. 1922) 84 Fla. 592 [94 So. 681, 682–683] ["The contention that the oath of a public official requiring him to obey the Constitution places upon him the duty or obligation to determine whether an act is constitutional before he will obey it is . . . without merit. The fallacy in it is that every act of the legislature is presumptively constitutional until judicially declared otherwise, and the oath of office 'to obey the Constitution' means to obey the Constitution, not as the officer decides, but as judicially determined"].)[30]

---

[29] The brief footnote discussion in *Board of Education v. Allen* (1968) 392 U.S. 236, 241, footnote 5 [20 L.Ed.2d 1060, 88 S.Ct. 1923], relied upon by the city, does not conflict with this conclusion. In *Allen*, officials of a local public school district brought a court action challenging the validity, under the establishment clause of the First Amendment, of a state statute that required the school district to loan books free of charge to all students in the district, including students attending private religious schools. In the footnote in question, the court in *Allen* noted that no one had questioned the standing of the local district and its officials "to press their claim in this Court," and then stated that "[b]elieving [the statute in question] to be unconstitutional, [the officials] are in the position of having to choose between violating their oath [to support the United States Constitution] and taking a step—refusal to comply with [the applicable statute]—that would likely bring their expulsion from office and also a reduction in state funding for their school districts. There can be no doubt that appellants thus have a 'personal stake in the outcome' of this litigation." (*Allen,* 392 U.S. at p. 241, fn. 5, quoting *Baker v. Carr* (1962) 369 U.S. 186, 204 [7 L.Ed.2d 663, 82 S.Ct. 691].) The footnote's reference to the officials' oath to support the Constitution indicates no more than that the public officials' belief that the statute was unconstitutional afforded them standing *to bring a court action* to challenge the statute. The footnote in *Allen* does not hold that the federal Constitution, or a public official's oath to support the federal Constitution, authorizes a state official to undertake official action forbidden by a state statute based solely on the official's belief that the statute is unconstitutional, and, as discussed below (*post*, pp. 1109–1112), numerous federal authorities refute that proposition.

[30] The city also obliquely suggests that the general rule requiring a public official to perform a ministerial duty prescribed by statute, despite the official's personal view that the statute is unconstitutional, is contrary to the teaching of the Nuremberg trials, which rejected the "I was just following orders" defense. In response to a similar claim, the federal district court in *Haring v. Blumenthal* (D.D.C. 1979) 471 F.Supp. 1172, 1178, footnote 15, cogently observed: "Plaintiff's comparison of his situation with that of the Nuremberg defendants is grossly simplistic. The Nuremberg defendants could have escaped liability by failing to seek and retain positions which exposed them to the execution of objectionable activity; and, should plaintiff feel sufficiently strongly about the matter, he may do likewise. Beyond that, plaintiff's analogy demonstrates primarily that debates and dialogues on public issues have become so debased in recent years that such terms as genocide, war crime, crimes against humanity, and the like are bandied about with considerable abandon in connection with almost every conceivable controversial issue of public policy. There is not the slightest similarity between the crimes committed under the aegis of a violent dictatorship and the implementation of laws adopted under a system of government which offers free elections, freedom of expression, and an independent judiciary as safeguards against excesses and as a guarantee of the ultimate rule of a sovereign citizenry." We agree.

## G

The city further contends that a general rule requiring an executive official to comply with an existing statute unless and until the statute has been judicially determined to be unconstitutional is impractical and would lead to intolerable circumstances. The city posits a hypothetical example of a public official faced with a statute that is identical in all respects to another statute that a court already has determined is unconstitutional, and suggests it would be absurd to require the official to apply the clearly invalid statute in that instance. For support, the city points to a passage in the majority opinion in *Southern Pacific*, which asks rhetorically: "[W]hen the United States Supreme Court, for example, repudiates the separate but equal doctrine established by the statutes of one state, should the school boards of other states continue to apply identical statutes until a court declares them invalid[?]" (*Southern Pacific, supra,* 18 Cal.3d 308, 311, fn. 2.)

 Whatever force this argument might have in a case in which a governing decision previously has found an identical statute unconstitutional or in which the invalidity of the statute is so patent or clearly established that no reasonable official could believe the statute is constitutional,[31] the argument plainly is of no avail here. Although we have no occasion in this case to determine the constitutionality of the current California marriage statutes, we can say with confidence that the asserted invalidity of those statutes certainly is not so patent or clearly established that no reasonable official could believe that the current California marriage statutes are valid. Indeed, the city cannot point to any judicial decision that has held a statute limiting marriage to a man and a woman unconstitutional under the California or federal Constitution. Instead, the city relies on state court decisions from Massachusetts, Vermont, and Hawaii, that, in interpreting their own state constitutions, assertedly have found similar statutory restrictions to violate provisions of their state's own constitution. (See *Goodridge v. Department of Pub. Health, supra,* 798 N.E.2d 941; *Baker v. State of*

---

[31] See, for example, *Schmid v. Lovette* (1984) 154 Cal.App.3d 466, 474 [201 Cal.Rptr. 424] (holding that article III, section 3.5 of the California Constitution did not require public community college officials to continue to apply a statute requiring public employees to sign an anti-Communist-Party loyalty oath when comparable statutes had been held unconstitutional by both federal and state supreme court decisions) and *LSO, Ltd. v. Stroh, supra,* 205 F.2d 1146, 1160 (holding that no reasonable official could have believed that a statute prohibiting exhibition of nonobscene erotic art on any premises holding a liquor license could constitutionally be applied in light of a then recent United States Supreme Court decision).

*Vermont, supra,* 744 A.2d 864; *Baehr v. Lewin, supra,* 852 P.2d 44.)[32] A significant number of other state and federal courts, however, have reached a contrary conclusion and have upheld the constitutional validity of such a restriction on marriage under both the federal Constitution and other state constitutions. (See, e.g., *Baker v. Nelson* (1971) 291 Minn. 310 [191 N.W.2d 185, 186–187], app. dism. for want of substantial federal question (1972) 409 U.S. 810 [federal Constitution];[33] *Standhardt v. Super. Ct., supra,* 77 P.3d

---

[32] Of the three decisions cited by the city, the Massachusetts decision in *Goodridge v. Department of Pub. Health, supra,* 798 N.E.2d 941, appears to be the only one squarely to hold that a state constitution precludes the state from withholding the status of marriage from same-sex couples.

In *Baker v. State of Vermont, supra,* 744 A.2d 864, the court summarized its conclusion under the "common benefits" clause of the Vermont Constitution, as follows: "[T]he State is constitutionally required to extend to same-sex couples the common benefits and protections that flow from marriage under Vermont law. Whether this ultimately takes the form of inclusion within the marriage laws themselves or a parallel 'domestic partnership' system or some equivalent statutory alternative rests with the Legislature." (744 A.2d at p. 867; see also *id.* at pp. 886–887.) The Vermont Legislature subsequently enacted a civil union statute. (Vt. Stat. Ann., tit. 15, §§ 1201–1207 (supp. 2001).)

In *Baehr v. Lewin, supra,* 852 P.2d 44, the Hawaii Supreme Court held that the trial court in that case had erred in granting judgment on the pleadings against three same-sex couples who had sued for declaratory and injunctive relief after being denied marriage licenses, concluding that the plaintiffs were entitled to go forward with their action and that, under the equal protection clause of the Hawaii Constitution, the state would have to demonstrate a compelling interest to justify the statutory classification. (852 P.2d at p. 68.) Following the decision in *Baehr,* the voters in Hawaii amended the Hawaii Constitution to limit marriage to unions between a man and a woman, and, in light of that amendment, the Hawaii Supreme Court thereafter ordered entry of judgment in favor of the defendants in the *Baehr* litigation. (See *Baehr v. Miike* (1999) 92 Haw. 634 [994 P.2d 566] [full order reported at 1999 Haw.Lexis 391].)

In addition to relying upon *Goodridge, Baker,* and *Baehr,* the city points to a passage in the dissenting opinion of Justice Scalia in *Lawrence v. Texas* (2003) 539 U.S. 558 [156 L.Ed.2d 508, 123 S.Ct. 2472], in which he expressed the view that the reasoning of the majority opinion in *Lawrence*—holding a Texas sodomy statute unconstitutional—would lead to the conclusion that a statute precluding same-sex marriages also would be unconstitutional. (*Lawrence v. Texas, supra,* 539 U.S. at pp. 604–605 (dis. opn. of Scalia, J.).) The majority opinion in *Lawrence,* however, expressly stated that "[t]he present case . . . does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter." (*Lawrence, supra,* 539 U.S. at p. 578). In light of this very specific disclaimer in the majority opinion in *Lawrence,* we conclude that the city cannot plausibly claim that the *Lawrence* decision clearly establishes that a state statute limiting marriage to a man and a woman is unconstitutional under the federal Constitution. (See also *Standhardt v. Super. Ct.* (Ariz.Ct.App. 2003) 77 P.3d 451, 454–460, 464–465 [post-*Lawrence* case rejecting claim that *Lawrence* indicates the federal Constitution guarantees the right to same-sex marriage].)

[33] Petitioners in *Lewis* maintain that because the United States Supreme Court summarily dismissed the appeal in *Baker v. Nelson* for want of a substantial federal question and because such a summary dismissal is treated as a decision on the merits (see *Mandel v. Bradley* (1977) 432 U.S. 173, 176 [53 L.Ed.2d 199, 97 S.Ct. 2238]; *Hicks v. Miranda* (1975) 422 U.S. 332, 344 [45 L.Ed.2d 223, 95 S.Ct. 2281]), the summary dismissal in *Baker v. Nelson* definitively

451, 454–465 [federal and Arizona Constitutions]; *Dean v. District of Columbia* (D.C. 1995) 653 A.2d 307, 361–364 (opns. of Terry, J. & Steadman, J.) [federal Constitution]; *Jones v. Hallahan* (Ky.Ct.App. 1973) 501 S.W.2d 588, 590 [federal Constitution]; *Singer v. Hara* (1974) 11 Wn.App. 247 [522 P.2d 1187, 1189–1197] [federal and Washington Constitutions]; *Adams v. Howerton* (C.D.Cal. 1980) 486 F.Supp. 1119, 1124–1125, affd. (9th Cir. 1982) 673 F.2d 1036, cert. den. (1982) 458 U.S. 1111 [federal Constitution].) Although the state court decisions from Massachusetts, Vermont, and Hawaii relied upon by the city surely would be of interest to a California court faced with the question whether the current California marriage statutes violate the California Constitution, a California court would be equally interested in the decisions of the courts that have reached a contrary conclusion (and in the reasoning of the minority opinions in the state court decisions relied upon by the city [see *Goodridge v. Department of Pub. Health, supra,* 798 N.E.2d 941, 974–1105 (dis. opns. of Spina, J., Sosman, J., & Cordy, J.); *Baehr v. Lewin, supra,* 852 P.2d 44, 70–73 (dis. opn. of Heen, J.)]). In light of the absence of any California authority directly on point and the sharp division of judicial views expressed in the out-of-state decisions that have considered similar constitutional challenges, this plainly is not an instance in which the invalidity of the California marriage statutes is so patent or clearly established that no reasonable official could believe that the statutes are constitutional. Therefore, this case does not fall within any narrow exception that may apply to instances in which it would be absurd or unreasonable to require a public official to comply with a statute that any reasonable official would conclude is unconstitutional.

### H

Accordingly, we conclude that, under California law, the city officials had no authority to refuse to perform their ministerial duty in conformity with the current California marriage statutes on the basis of their view that the

---

establishes that, under current federal law, a statute limiting marriage to a man and a woman does not violate the federal Constitution. The city, on the other hand, cites a number of decisions stating that when there have been subsequent doctrinal developments in the United States Supreme Court that undermine the holding in a summary dismissal, the lower courts are not bound to follow the summary dismissal as controlling authority (see, e.g., *Tenafly Eruv Ass'n v. Borough of Tenafly* (3d Cir. 2002) 309 F.3d 144, 173, fn. 33; *Lecates v. Justice of the Peace Court No. 4 of Delaware* (3d Cir. 1980) 637 F.2d 898, 904), and the city argues that there have been such doctrinal developments in subsequent high court decisions that undermine the holding in *Baker v. Nelson.* We find no need to resolve this dispute here, because whatever the current effect of the summary dismissal in *Baker v. Nelson,* the case before us clearly does not present an instance in which the invalidity of the current California marriage statutes is so patent or clearly established that no reasonable official could believe that the statutes are constitutional.

statutory limitation of marriage to a couple comprised of a man and a woman is unconstitutional.

It is worth noting that the California rule generally precluding an executive official from refusing to perform a ministerial duty imposed by statute on the basis of the official's determination or opinion that the statute is unconstitutional is consistent with the general rule applied in the overwhelming majority of cases from other jurisdictions. (See generally Annot., Unconstitutionality of Statute as Defense to Mandamus Proceeding (1924) 30 A.L.R. 378, 379 ["[t]he weight of authority [holds] that a public officer whose duties are of a ministerial character cannot question the constitutionality of a statute as a defense to a mandamus proceeding to compel him to perform some official duty, where in the performance of such duty his personal interests or rights will not be affected, and he will not incur any personal liability, or violate his oath of office"]; Annot. (1940) 129 A.L.R. 941 [supplementing 30 A.L.R. 378]; see also Note (1928) 42 Harv. L.Rev. 1071.)[34]

---

[34] Our review of the decisions of our sister states and the District of Columbia reflects that of the 33 jurisdictions in which decisions have been found addressing this subject, 26 appear to have recognized and endorsed the proposition that, as a general rule, an executive official who is charged with a ministerial duty to enforce a statute has no authority to refuse to apply the statute, in the absence of a judicial determination that the statute is unconstitutional, on the ground that the official believes the statute is unconstitutional, although many of the jurisdictions, like California, also recognize an exception for bond or other public finance cases, in which an official is permitted to refuse to apply a statute as a means of obtaining a timely judicial determination of the legality of the bond or public expenditure. (See *Denver Urban Renewal Authority v. Byrne* (Colo. 1980) 618 P.2d 1374, 1379–1380 [foll. *Ames v. People* (1899) 26 Colo. 83 [56 P. 656, 658]]; *Levitt v. Attorney General* (1930) 111 Conn. 634 [151 A. 171, 176]; *Panitz v. District of Columbia* (D.C. Cir. 1940) 112 F.2d 39, 41–42 [applying District of Columbia law]; *Fuchs v. Robbins* (Fla. 2002) 818 So.2d 460, 463–464 [foll. *State v. State Board of Equalizers, supra,* 94 So. 681, 682–684]; *Taylor v. State* (1931) 174 Ga. 52 [162 S.E. 504, 508–509]; *Howell v. Board of Comm'rs* (1898) 6 Idaho 154 [53 P. 542, 543]; *People ex rel. Atty. Gen. v. Salomon* (1870) 54 Ill. 39, 44–46; *Bd. of Sup'rs of Linn Cty. v. Dept. of Revenue* (Iowa 1978) 263 N.W.2d 227, 232–234 [foll. *Charles Hewitt & Sons Co. v. Keller* (1937) 223 Iowa 1372 [275 N.W. 94, 95–97]]; *Tincher v. Commonwealth* (1925) 208 Ky. 661 [271 S.W. 1066, 1068]; *Dore v. Tugwell* (1955) 228 La. 807 [84 So.2d 199, 201–202] [foll. *State v. Heard* (1895) 47 La.Ann. 1679 [18 So. 746, 749–752]]; *Smyth v. Titcomb* (1850) 31 Me. 272, 285; *Maryland Classified Emp. Ass'n v. Anderson* (1977) 281 Md. 496 [380 A.2d 1032, 1035–1037]; *Assessors of Haverhill v. New England Tel. & Tel. Co.* (1955) 332 Mass. 357 [124 N.E.2d 917, 920–921]; *State v. Steele County Bd. of Comm'rs* (1930) 181 Minn. 427 [232 N.W. 737, 738–739]; *St. Louis County v. Litzinger* (Mo. 1963) 372 S.W.2d 880, 881–882 [foll. *State v. Becker* (1931) 328 Mo. 541 [41 S.W.2d 188, 190–191]]; *State v. McFarlan* (1927) 78 Mont. 156 [252 P. 805, 808]; *State v. Sedillo* (1929) 34 N.M. 1 [275 P. 765, 765–767]; *Attorney General v. Taubenheimer* (1917) 178 App.Div. 321, 321 [164 N.Y.Supp. 904, 904]; *Dept. of State Highways v. Baker* (1940) 69 N.D. 702 [290 N.W. 257, 260–262]; *State v. Griffith* (1940) 136 Ohio St. 334 [25 N.E.2d 847, 848–849]; *State ex rel. Cruce v. Cease* (1911) 28 Okla. 271 [114 P. 251, 252–253]; *Commonwealth v. Mathues* (1904) 210 Pa. 372 [59 A. 961, 964–969]; *State v. Burley* (1908) 80 S.C. 127 [61 S.E. 255, 257]; *Thoreson v. State Board of Examiners* (1899) 19 Utah 18 [57 P. 175, 177–179]; *City of Montpelier v. Gates* (1934) 106 Vt. 116 [170 A. 473, 476–477]; *Capito v. Topping* (1909) 65 W.Va. 587 [64 S.E.

Although there are numerous out-of-state cases that address this issue, one of the most quoted decisions is *State v. Heard, supra,* 18 So. 746, 752, where the court, after an extensive review of the then existing authorities from various jurisdictions, concluded: "[E]xecutive officers of the State government have no authority to decline the performance of purely ministerial duties which are imposed upon them by a law, on the ground that it contravenes the Constitution. Laws are presumed to be, and must be treated and acted upon by subordinate executive functionaries as constitutional and legal, until their unconstitutionality or illegality has been judicially established, for, in all well regulated government, obedience to its laws by executive officers is absolutely essential, and of paramount importance. Were it not so the most inextricable confusion would inevitably result, and 'produce such collisions in the administration of public affairs as to materially impede the proper and necessary operations of the government.' 'It was surely never intended that an executive functionary should nullify a law by neglecting or refusing to execute it.' " (See also *Department of State Highways v. Baker, supra,* 290 N.W. 257, 259 ["There is no question as to the general rule that a subordinate ministerial officer to whom no injury can result and to whom no violation of duty can be imputed by reason of compliance with the statute may not question the constitutionality of the statute imposing such duty"]; *State v. Becker, supra,* 41 S.W.2d 188, 190 ["It is well settled in this state and in a great majority of our sister states that, as a general rule, a ministerial officer cannot defend his refusal to perform a duty prescribed by a statute on the ground that such statute is unconstitutional"]; *State v. Steele*

---

845, 846]; *Riverton Valley D. Dist. v. Board of County Comm'rs* (1937) 52 Wyo. 336 [74 P.2d 871, 873].)

Of the seven states that may be viewed as adopting the minority position, most have addressed the issue only in the context of actions either relating to matters affecting the expenditure of public funds or where the rights or interests of the public officer or public entity were directly at stake. (See *State v. Steinwedel* (1932) 203 Ind. 457 [180 N.E. 865, 866–868] [public expenditure]; *Toombs v. Sharkey* (1925) 140 Miss. 676 [106 So. 273, 277] [public expenditure]; *Van Horn v. State* (1895) 46 Neb. 62 [64 N.W. 365, 371–372] [county reorganization]; *State v. Slusher* (1926) 119 Ore. 141 [248 P. 358, 359–360] [tax collection]; *Holman v. Pabst* (Tex. 1930) 27 S.W.2d 340, 342–343 [local election procedure]; *Hindman v. Boyd* (1906) 42 Wash. 17 [84 P. 609, 612] [local election procedure]; *State v. Tappan* (1872) 29 Wis. 664 [9 Am.Rep. 622, 635] [tax collection].)

A number of the out-of-state cases discuss a separate line of cases that address the issue whether a public official or public entity has "standing" to bring a court action—for example, a declaratory judgment action—challenging the constitutionality of a statute the official or entity is obligated to comply with or enforce. (See, e.g., *Fuchs v. Robbins, supra,* 818 So.2d 460, 463–464; *Bd. of Sup'rs of Linn Cty. v. Dept. of Revenue, supra,* 263 N.W.2d 227, 233–234; see also *City of Kenosha* (1967) 35 Wis.2d 317 [151 N.W.2d 36, 42–43].) Although the standing issue involves some of the same considerations that are applicable to the issue we face here, from a separation of powers perspective, conduct by an executive official that simply asks a court to determine the constitutionality of a statute would appear to raise much less concern than an executive official's unilateral refusal to enforce a statute based on the official's opinion that the statute is unconstitutional.

*County Board of Com'rs, supra,* 232 N.W. 737, 738 [although "[t]he authorities are in conflict," "[t]he better doctrine, supported by the weight of authority is that an official so charged with the performance of a ministerial duty will not be allowed to question the constitutionality of such a law. . . . Officials acting ministerially are not clothed with judicial authority. . . . Their authority is the command of the statute, and it is the limit of their power"]; *State v. State Board of Equalizers, supra,* 94 So. 681, 683 ["It is contended that an *individual* may refuse to obey a law that he believes to be unconstitutional, and take a chance on its fate in the courts. He does this, however, 'at his peril'; the 'peril' being to suffer the consequences, such as fine or imprisonment, or both, if the courts should hold the act to be constitutional. [¶] A *ministerial officer* refusing to enforce a law because in his opinion it is unconstitutional takes no such risk. He does nothing 'at his peril,' because he subjects himself to no penalty if his opinion as to the unconstitutionality of an act is not sustained by the courts. [¶] It is the doctrine of nullification, pure and simple, and whatever may have been said of the soundness of that doctrine when sought to be applied by states to acts of Congress, the most ardent followers of Mr. Calhoun never extended it to give to ministerial officers the right and power to nullify a legislative enactment" (italics added)].)

## I

In addition to the California decisions reviewed above and the weight of judicial authority from other jurisdictions, consideration of the practical consequences of a contrary rule further demonstrates the unsoundness of the city's position.

To begin with, most local executive officials have no legal training and thus lack the relevant expertise to make constitutional determinations. Although every individual (lawyer or nonlawyer) is, of course, free to form his or her own opinion of what the Constitution means and how it should be interpreted and applied, a local executive official has no authority to impose his or her personal view on others by refusing to comply with a ministerial duty imposed by statute. (See, e.g., *Southern Pacific, supra,* 18 Cal.3d 308, 321 (conc. & dis. opn. of Mosk, J.) ["Certainly attorneys have no monopoly on wisdom, but a person trained for three or more years in a college of law and then tempered with at least a decade of experience within the judicial system is likely to be far better equipped to make difficult constitutional judgments than a lay administrator with no background in the law"].)[35]

---

[35] Several amici curiae point out that nonattorney public officials are able to seek legal advice from a county counsel or city attorney (see Gov. Code, §§ 27640, 41801) and assert that such nonattorney officials presumably will do so before disobeying a statute on the ground it is unconstitutional. County counsel and city attorneys, however, also are executive officers who,

Second, if, as the city maintains, a local official were to possess the authority to act on the basis of his or her own constitutional determination, such an official generally would arrive at that determination without affording the affected individuals any due process safeguards and, in particular, without providing any opportunity for those supporting the constitutionality of the statutes to be heard. In its opposition to the initial petition filed in this case, the city urged this court not to immediately accept jurisdiction over the substantive question of the constitutionality of California's marriage laws at this time, because that question properly could be determined only after a full presentation of evidence before a trial court. The city officials themselves, however, made their own constitutional determination without conducting any such evidentiary hearing or taking other measures designed to protect the rights of those who maintain that the statute is constitutional. Thus, despite the settled rule that a duly enacted statute is presumed to be constitutional, under the city's proposed rule a local executive official would be free to determine that a statute is unconstitutional and refuse to enforce it, without providing even the most rudimentary of due process procedures—notice and an opportunity to be heard—to anyone directly affected by the official's action.

Third, there are thousands of elected and appointed public officials in California's 58 counties charged with the ministerial duty of enforcing thousands of state statutes. If each official were empowered to decide whether or not to carry out each ministerial act based upon the official's own personal judgment of the constitutionality of an underlying statute, the enforcement of statutes would become haphazard, leading to confusion and chaos and thwarting the uniform statewide treatment that state statutes generally are intended to provide. (Cf. *Haring v. Blumenthal, supra,* 471 F.Supp. 1172, 1178–1179 ["Unless and until the Congress, or a court of competent jurisdiction . . . , determines that a particular tax exemption ruling is invalid, the employees of the [Internal Revenue] Service . . . are obliged to implement that ruling. Not merely the concept of a uniform tax policy but the effectiveness of the government of the United States as a functioning entity would be

like a nonattorney public official, have not been granted judicial power and thus also lack the authority to determine that a statute is unconstitutional and that it should not be followed. A nonattorney public official generally will be in no position to critically evaluate legal advice obtained from such counsel regarding the question of a statute's constitutionality. Outside the very narrow category of instances in which legal counsel can advise that the invalidity of the statute is so patent or clearly established that *any* reasonable public official would conclude that the statute in question is unconstitutional (see, *ante,* pp. 1102–1104), whenever a nonattorney official defies a statutory mandate on the basis of a county counsel's or city attorney's legal advice, the official's refusal to apply the statute actually will rest upon legal counsel's judgment on a debatable constitutional question, rather than upon the judgment of the official on whom the statute imposes a ministerial duty. Furthermore, a nonattorney official is under no obligation to act in accordance with a legal opinion (often given confidentially) provided by a county counsel or city attorney.

in jeopardy if each employee could take it upon himself to decide which particular laws, regulations, and policies are legal or illegal, and to base his official actions upon that private determination"].) Although in the past the multiplicity of public officials performing similar ministerial acts under a single statute never has posed a problem in this regard, that is undoubtedly true only because most officials never imagined they had the authority to determine the constitutionality of a statute that they have a ministerial duty to enforce. Were we to hold that such officials possess this authority, it is not difficult to anticipate that private individuals who oppose enforcement of a statute and question its constitutionality would attempt to influence ministerial officials in various locales to exercise—on behalf of such opponents—the officials' newly recognized authority. The circumstance that many local officials have no legal training would only exacerbate the problem. As a consequence, the uneven enforcement of statutory mandates in different local jurisdictions likely would become a significant concern.

Fourth, the confused state of affairs arising from diverse actions by a multiplicity of local officials frequently would continue for a considerable period of time, because under the city's proposed rule a court generally could not order a public official to comply with the challenged statute until the court actually had determined that it was constitutional. In view of the many instances in which a constitutional challenge to a statute entails lengthy litigation, the lack of uniform treatment afforded to similarly situated citizens throughout the state often would be a long-term phenomenon.

These practical considerations simply confirm the soundness of the established rule that an executive official generally does not have the authority to refuse to comply with a ministerial duty imposed by statute on the basis of the official's opinion that the statute is unconstitutional.[36]

## V

The city further claims, however, that even if *California law* does not recognize the authority of a local official to refuse to comply with a statutorily mandated ministerial duty absent a judicial determination that the statute is unconstitutional, under the federal supremacy clause (U.S. Const., art. VI, § 2) California lacks the power to require a public official to comply with a state statute that the official believes violates the federal Constitution.

---

[36] Despite the suggestion in Justice Werdegar's concurring and dissenting opinion (*post*, at pp. 1136–1139), this established rule does not represent any sort of broad claim of *judicial* power over the *executive* branch, but on the contrary reflects the general duty of an *executive* official, in carrying out a ministerial function authorized by statute, not to assume the authority to supersede or contravene the directions of the *legislative* branch or to exercise the traditional function of the *judicial* branch.

Although in the present case the mayor's initial letter to the county clerk relied solely upon the asserted unconstitutionality of the California marriage statutes under the *California* Constitution, the city, in the opposition filed in this court, for the first time advanced the position that the action taken by the city officials was based, at least in part, on their belief that the California statutes violate the *federal* Constitution, and the city now rests its supremacy clause claim on this newly asserted belief. Putting aside the question of the bona fides of this belatedly proffered rationale, we conclude that, in any event, the federal supremacy clause provides no support for the city's argument.

To begin with, the principal cases upon which the city relies—*Ex Parte Young* (1908) 209 U.S. 123 [52 L.Ed. 714, 28 S.Ct. 441] and *LSO, Ltd. v. Stroh, supra,* 205 F.3d 1146—are readily distinguishable from .the present case. Those cases stand only for the proposition that the circumstance that a state official is acting pursuant to the provisions of an applicable state statute does not necessarily shield the official (or the public entity on whose behalf the official acts) either from an injunction or a monetary judgment issued by a federal court, where the federal court subsequently determines that the state statute violates the federal Constitution.[37] The city has not cited any case holding that the federal Constitution prohibits a state from defining the authority of a state's executive officials in a manner that requires such officials to comply with a clearly applicable statute unless and until such a statute is judicially determined to be unconstitutional, nor any case holding that the federal Constitution compels a state to permit every executive official, state or local, to refuse to enforce an applicable statutory provision whenever the official personally believes the statute violates the federal Constitution.

 Furthermore, numerous pronouncements by the United States Supreme Court directly refute the city's contention that the supremacy clause or any other provision of the federal Constitution embodies such a principle. To begin with, the high court's position on the proper role of federal executive officials with regard to constitutional determinations is instructive. In *Davies Warehouse Co. v. Bowles* (1944) 321 U.S. 144, 152–153 [88 L.Ed. 635, 64 S.Ct. 474], for example, in response to the plaintiff's contention that under one proposed reading of the applicable statute "the [federal Price] Administrator [an executive official] would have to decide whether the state regulation is constitutional before he should recognize it," the United States Supreme

---

[37] As explained above (*ante,* pp. 1097–1098), under the circumstances in this case there is no plausible basis for suggesting that the city officials would have subjected themselves to personal liability had they acted in conformity with the terms of the current California marriage statutes.

Court stated: "We cannot give weight to this view of [the Price Administrator's] functions, which we think it unduly magnifies. *State statutes, like federal ones, are entitled to the presumption of constitutionality until their invalidity is judicially declared. Certainly no power to adjudicate constitutional issues is conferred on the Administrator. . . . We think the Administrator will not be remiss in his duties if he assumes the constitutionality of state regulatory statutes, under both state and federal constitutions, in the absence of a contrary judicial determination.*" (Italics added; see also *Weinberger v. Salfi* (1975) 422 U.S. 749, 765 [45 L.Ed.2d 522, 95 S.Ct. 2457] ["[T]he constitutionality of a statutory requirement [is] a matter which is beyond [the Secretary of Health, Education, and Welfare's] jurisdiction to determine"]; *Johnson v. Robison* (1974) 415 U.S. 361, 368 [39 L.Ed.2d 389, 94 S.Ct. 1160] ["[a]djudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies"]; *Oestereich v. Selective Service Board* (1968) 393 U.S. 233, 242 [21 L.Ed.2d 402, 89 S.Ct. 414] (conc. opn. of Harlan, J.) [same]; cf. *Thunder Basin Coast Co. v. Reich* (1994) 510 U.S. 200, 215 [127 L.Ed.2d 29, 114 S.Ct. 771].) In light of the high court's repeated statements that federal executive officials generally lack authority to determine the constitutionality of statutes, the city's claim that the federal supremacy clause itself grants a state or local official the authority to refuse to enforce a statute that the official believes is unconstitutional is plainly untenable.

Furthermore, there are several earlier United States Supreme Court cases that even more directly refute the city's contention. *Smith v. Indiana* (1903) 191 U.S. 138 [48 L.Ed. 125, 24 S.Ct. 51] was a case, arising from the Indiana state courts, in which a county auditor had refused to grant a statutorily authorized exemption to a taxpayer because the auditor believed the exemption violated the federal Constitution. A mandate action was filed against the auditor, and the state courts permitted the auditor to raise and litigate the asserted unconstitutionality of the statute as a defense in the mandate action, ultimately determining that the exemption was constitutionally permissible and directing the auditor to grant the exemption. The auditor appealed the state court decision upholding the constitutionality of the state statute to the United States Supreme Court.

In its opinion in *Smith*, the high court observed that "there are many authorities to the effect that a ministerial officer, charged by law with the duty of enforcing a certain statute, cannot refuse to perform his plain duty thereunder upon the ground that in his opinion it is repugnant to the Constitution" (*Smith v. Indiana, supra,* 191 U.S. at p. 148), but it recognized that a state court has "the power . . . to assume jurisdiction [in such] a case if [it] choose[s] to do so." (*Ibid.*) At the same time, however, the court in *Smith* stated explicitly that "the power of a public officer to question the constitutionality of a statute as an excuse for refusing to enforce it . . . *is a purely*

*local question*" (*ibid.*, italics added)—that is, purely a question of state (not federal) law—a conclusion that directly refutes the city's claim that federal law requires a state to recognize the authority of a ministerial official to refuse to comply with a statute whenever the official believes it violates the federal Constitution. Moreover, in *Smith* itself the United States Supreme Court went on to hold that although the state court in that case had permitted the auditor to litigate the constitutionality of the state statute, the auditor did not have a sufficient personal interest in the litigation to support jurisdiction in the United States Supreme Court; thus the high court dismissed the auditor's appeal without reaching the question of the constitutionality of the underlying statute.[38] A few years later, the high court followed its decision in *Smith*, dismissing a similar appeal by a state auditor in *Braxton County Court v. West Virginia* (1908) 208 U.S. 192, 197 [52 L.Ed. 450, 28 S.Ct. 275].

In light of the foregoing high court decisions, we conclude that the California rule set forth above does not conflict with any federal constitutional requirement.

## VI

The city contends, however, that even if we conclude that its officials lacked the authority to refuse to enforce the marriage statutes, we still cannot issue the writ of mandate sought by petitioners without first determining whether California's current marriage statutes are constitutional, in light of the general proposition that courts will not issue a writ of mandate to require a public official to perform an unconstitutional act. As the Florida Supreme Court explained in a similar context, however, "[i]t is no answer to say that the courts will not require a ministerial officer to perform an unconstitutional act. That aspect of the case is not before us. We must first determine the power of the ministerial officer to refuse to perform a statutory duty because *in his opinion* the law is unconstitutional. When we decide that, we do not get to the question of the constitutionality of the act, and it will not be decided." (*State v. State Board of Equalizers, supra,* 94 So. 681, 684.) Accordingly, because we have concluded that the city officials have no authority to refuse to apply the current marriage statutes in the absence of a judicial determination that these statutes are unconstitutional, we conclude that the requested writ of mandate should issue.

---

[38] The court in *Smith* explained in this regard: "It is evident that the auditor had no personal interest in the litigation. He had certain duties as a public officer to perform. The performance of those duties was of no personal benefit to him. Their non-performance was equally so. . . . He was testing the constitutionality of the law purely in the interest of third persons, viz., the taxpayers . . . ." (*Smith v. Indiana, supra,* 191 U.S. at pp. 148–149.)

## VII

Finally, we must determine the appropriate scope of the relief to be ordered. As a general matter, the nature of the relief warranted in a mandate action is dependent upon the circumstances of the particular case, and a court is not necessarily limited by the prayer sought in the mandate petition but may grant the relief it deems appropriate. (See *Johnson v. Fontana County F.P. Dist.* (1940) 15 Cal.2d 380, 391–392 [101 P.2d 1092]; *George M. v. Superior Court* (1988) 201 Cal.App.3d 755, 760 [247 Cal.Rptr. 330]; *Sacramento City Police Dept. v. Superior Court* (1984) 156 Cal.App.3d 1193, 1197, fn. 5 [203 Cal.Rptr. 169].)

In the present case, we are faced with an unusual, perhaps unprecedented, set of circumstances. Here, local public officials have purported to authorize, perform, and register literally thousands of marriages in direct violation of explicit state statutes. The Attorney General, as well as a number of local taxpayers, have filed these original mandate proceedings in this court to halt the local officials' unauthorized conduct and to compel these officials to correct or undo the numerous unlawful actions they have taken in the immediate past. As explained above, we have determined that the city officials exceeded their authority in issuing marriage licenses to, solemnizing marriages of, and registering marriage certificates on behalf of, same-sex couples. Under these circumstances, we conclude that it is appropriate in this mandate proceeding not only to order the city officials to comply with the applicable statutes in the future, but also to direct the officials to take all necessary steps to remedy the continuing effect of their past unlawful actions, including correction of all relevant official records and notification of affected individuals of the invalidity of the officials' actions.

In light of the clear terms of Family Code section 300 *defining* marriage as a "personal relationship arising out of a civil contract between a man and a woman" and the legislative history of this provision demonstrating that the purpose of this limitation was to "prohibit persons of the same sex from entering lawful marriage" (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 607 (1977–1978 Reg. Sess.) as amended May 23, 1977, p. 1 [discussed, *ante,* p. 1076, fn. 11]), we believe it plainly follows that all same-sex marriages authorized, solemnized, or registered by the city officials must be considered void and of no legal effect from their inception. Although this precise issue has not previously been presented under California law, every court that has considered the question has determined that when state law limits marriage to a union between a man and a woman, a same-sex marriage performed in violation of state law is void and of no legal effect. (See, e.g., *Jones v. Hallahan, supra,* 501 S.W.2d 588, 589 [same-sex marriage "would not constitute a marriage" under Kentucky law]; *Anonymous v.*

*Anonymous* (N.Y.Sup.Ct. 1971) 67 Misc.2d 982 [325 N.Y.S.2d 499, 501] [under New York law, same-sex "marriage ceremony was a nullity" and "no legal relationship could be created by it"]; *McConnell v. Nooner* (8th Cir. 1976) 547 F.2d 54, 55–56 ["purported" same-sex marriage of no legal effect under Minnesota law]; *Adams v. Howerton, supra,* 486 F.Supp. 1119, 1122 [purported same-sex marriage has "no legal effect" under Colorado or federal law].) The city has not cited any case in which a same-sex marriage, performed in contravention of a state statute that bans such marriages and that has not judicially been held unconstitutional, has been given any legal effect.

The city and several amici curiae representing same-sex couples who obtained marriage licenses from city officials—and had certificates of registry of marriage registered by such officials—raise a number of objections to our determining that the same-sex marriages that have been performed in California are void and of no legal effect, but we conclude that none of these objections is meritorious.

 First, the city and amici curiae contend that the Attorney General and the petitioners in *Lewis* lack standing to challenge the validity of the same-sex marriages that already have been performed, relying upon the provisions of Family Code section 2211, which sets forth the categories of individuals who may bring an action to nullify a "voidable" marriage— categories that generally are limited to one of the parties to the marriage or, where a party to the marriage is a minor or a person incapable of giving legal consent, the parent, guardian, or conservator of such party. Past California decisions, however, make clear that the procedural requirements generally applicable in an action to nullify or annul a "voidable" marriage are inapplicable when a purported marriage is void from the beginning or is a legal nullity. As this court stated in *Estate of Gregorson* (1911) 160 Cal. 21, 26 [116 P. 60]: "A marriage prohibited as incestuous *or illegal* and declared to be 'void' or 'void from the beginning' is a legal nullity *and its validity may be asserted or shown in any proceeding in which the fact of marriage may be material.*" (Italics added.) In our view, the present mandate action, which seeks to compel public officials to correct the effects of their unauthorized official conduct in issuing marriage licenses to or registering marriage certificates of thousands of same-sex couples, is such a proceeding, because the validity or invalidity of the same-sex marriages authorized and registered by such officials is central to the scope of the remedy that may and should be ordered in this case.[39]

---

[39] Contrary to the assertion of Justice Werdegar's concurring and dissenting opinion (*post,* at p. 1136), the validity or invalidity of the existing same-sex marriages is material to this case not simply because the Attorney General has requested this court to decide that issue, but because resolution of the issue is necessary in determining the scope of the remedy that

▇▇▇ The city and amici curiae additionally contend that we cannot properly determine the validity or invalidity of the existing same-sex marriages in this proceeding because the parties to a marriage are indispensable parties to any legal action seeking to invalidate a marriage, and the thousands of same-sex couples whose marriages were authorized and registered by the local authorities are not formal parties to the present mandate proceeding. The city relies on cases involving actions that have been brought to annul a particular marriage on the basis of facts peculiar to that marriage, in which the courts have held the parties to the marriage to be indispensable parties. (See, e.g., *McClure v. Donovan* (1949) 33 Cal.2d 717, 725 [205 P.2d 17].) In the present instance, by contrast, the question of the validity or invalidity of a same-sex marriage does not depend upon any facts that are peculiar to any individual same-sex marriage, but rather is a purely legal question applicable to all existing same-sex marriages, and rests on the circumstance that the governing state statute limits marriage to a union between a man and a woman. Under ordinary principles of stare decisis, an appellate decision holding that, under current California statutes, a same-sex marriage performed in California is void from its inception effectively would resolve that legal issue with respect to all couples who had participated in same-sex marriages, even though such couples had not been parties to the original action. Because the validity or invalidity of same-sex marriages under current California law involves only a pure question of law, couples who are not formal parties to this action are in no different position than if this question of law had been presented and resolved in an action involving some other same-sex couple rather than in an action in which the legal arguments regarding the validity of such marriages have been vigorously asserted not only by the city officials who authorized and registered such marriages but also by various amici curiae representing similarly situated same-sex couples. Requiring a separate legal proceeding to be brought to invalidate each of the thousands of same-sex marriages, or requiring each of the thousands of same-sex couples to be named and served as parties in the present action, would add nothing of substance to this proceeding.

▇▇▇ The city and amici curiae further contend that it would violate the due process rights of the same-sex couples who obtained marriage licenses, and had their marriage certificates registered by the local officials, for this court to determine the validity of same-sex marriages without giving the couples notice and an opportunity to be heard. To begin with, there may be some question whether an individual who, through the deliberate unauthorized conduct of a public official, obtains a license, permit, or other status that clearly is not authorized by state law, possesses a constitutionally protected

---

properly should be ordered in this mandate action to correct, and undo the potentially disruptive consequences of, the unauthorized actions of the city officials.

property or liberty interest that gives rise to procedural due process guarantees. (Cf., e.g., *Snyder v. City of Minneapolis* (1989) 441 N.W.2d 781, 792; *Mellin v. Flood Brook Union School Dist.* (2001) 173 Vt. 202 [790 A.2d 408, 421]; *Gunkel v. City of Emporia, Kan.* (10th Cir. 1987) 835 F.2d 1302, 1304–1305 & fns. 7, 8.) In any event, these same-sex couples have not been denied the right to meaningfully participate in these proceedings. Although we have not permitted them to intervene formally in these actions as parties, our order denying intervention to a number of such couples explicitly was without prejudice to participation as amicus curiae, and numerous amicus curiae briefs have been filed on behalf of such couples directly addressing the question of the validity of the existing same-sex marriages. Accordingly, the legal arguments of such couples with regard to the question of the validity of the existing same-sex marriages have been heard and fully considered. Furthermore, under the procedure we adopt below (see, *post*, p. 1118), before the city takes corrective action with regard to the record of any particular same-sex marriage license or same-sex marriage certificate, each affected couple will receive individual notice and an opportunity to show that the holding of the present opinion is not applicable to the couple.

 The city and amici curiae next maintain that even if this court properly may address the validity of the existing same-sex marriages in this proceeding, under California law such marriages cannot be held void (or voidable, for that matter), because there is no California statute that explicitly provides that a marriage between two persons of the same sex or gender is void (or voidable). As we have seen, however, Family Code section 300 explicitly *defines* marriage as "a personal relation arising out of a civil contract between a man and a woman," and in view of the language and legislative history of this provision (see, *ante*, p. 1076, fn. 11), we believe that the Legislature has made clear its intent that a same-sex marriage performed in California is not a valid marriage under California law. Accordingly, we view Family Code section 300 itself as an explicit statutory provision establishing that the existing same-sex marriages at issue are void and invalid.

 The city and amici curiae also rely upon Family Code section 306, which provides in part that "[n]oncompliance with this part by a nonparty to the marriage does not invalidate the marriage," maintaining that this statute demonstrates that even if the county clerk erred in issuing marriage licenses to same-sex couples, such noncompliance by the county clerk (a nonparty to the marriage) does not invalidate the marriage. In our view, section 306— which is unofficially entitled "Procedural requirements; effect of noncompliance"—has no application here. The defect at issue clearly is not simply a procedural defect in the issuance of the license or in the solemnization or registration process. Indeed, it is not simply the invalidity or unauthorized nature of the *county clerk's* action in issuing a marriage license to a same-sex

couple that renders void any marriage between a same-sex couple. What renders such a purported marriage void is the circumstance that the current California statutes reflect a clear legislative decision to "prohibit persons of the same sex from entering lawful marriage." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 607 (1977–1978 Reg. Sess.) as amended May 23, 1977, discussed, *ante,* at p. 1076, fn. 11.) It is that substantive legislative limitation on the institution of marriage, and not simply the circumstance that the actions of the county clerk or county recorder were unauthorized, that renders the existing same-sex marriages invalid and void from the beginning.

Finally, the city urges this court to postpone the determination of the validity of the same-sex marriages that already have been performed and registered until a court rules on the substantive constitutional challenges to the California marriage statutes that are now pending in superior court. From a practical perspective, we believe it would not be prudent or wise to leave the validity of these marriages in limbo for what might be a substantial period of time given the potential confusion (for third parties, such as employers, insurers, or other governmental entities, as well as for the affected couples) that such an uncertain status inevitably would entail.[40]

In any event, we believe such a delay in decision is unwarranted on more fundamental grounds. As we have explained, because Family Code section 300 clearly limits marriage in California to a marriage between a man and a woman and flatly prohibits persons of the same sex from lawfully marrying in California, the governing authorities establish that the same-sex marriages that already have been performed are void and of no legal effect *from their inception.* (See, *ante,* p. 1113 and cases cited; see also *Estate of Gregorson, supra,* 160 Cal. 21, 26 ["A marriage prohibited as . . . illegal and declared to be 'void' or 'void from the beginning' is a legal nullity . . . ."].) In view of this well-established rule, we do not believe it would be responsible or appropriate for this court to fail at this time to inform the parties to the same-sex marriages and other persons whose legal rights and responsibilities may depend upon the validity or invalidity of these marriages that these marriages are invalid, notwithstanding the pendency of numerous lawsuits challenging the constitutionality of California's marriage statutes. Withholding or delaying a ruling on the current validity of the existing same-sex marriages might lead numerous persons to make fundamental changes in their lives or otherwise proceed on the basis of erroneous expectations, creating potentially irreparable harm.

---

[40] Whether or not any same-sex couple "has filed a lawsuit seeking the legal benefits of their purported marriage" (conc. & dis. opn. of Werdegar, J., *post,* at p. 1134), there can be no question that the legal status of such couples has and will continue to generate numerous questions for such couples and third parties that must be resolved on an ongoing basis.

 Although the city and the amici curiae representing same-sex couples suggest that these couples would prefer to live with uncertainty rather than be told at this point that the marriages are invalid, in light of the explicit terms of Family Code section 300 and the warning included in the same-sex marriage license applications provided by the city (see, *ante*, p. 1071, fn. 5) these couples clearly were on notice that the validity of their marriages was dependent upon whether a court would find that the city officials had authority to allow same-sex marriages. Now that we have confirmed that the city officials lack this authority, we do not believe that these couples have a persuasive equitable claim to have the validity of the marriages left in doubt at this point in time, creating uncertainty and potential harm to others who may need to know whether the marriages are valid or not. Had the current constitutional challenges to the California marriage statutes followed the traditional and proper course (see, *ante*, pp. 1099–1100), no same-sex marriage would have been conducted in California prior to a judicial determination that the current California marriage statutes are unconstitutional. Accordingly, as part of the remedy for the city officials' unauthorized and unlawful actions, we believe it is appropriate to make clear that the same-sex marriages that already have purportedly come into being must be considered void from their inception. Of course, should the current California statutes limiting marriage to a man and a woman ultimately be repealed or be held unconstitutional, the affected couples then would be free to obtain lawfully authorized marriage licenses, have their marriages lawfully solemnized, and lawfully register their marriage certificates.[41]

Accordingly, to remedy the effects of the city officials' unauthorized actions, we shall direct the county clerk and the county recorder of the City and County of San Francisco to take the following corrective actions under the supervision of the California Director of Health Services, who, by statute, has general supervisory authority over the marriage license and marriage certificate process. (See, *ante*, pp. 1077–1078.) The county clerk and the county recorder are directed to (1) identify all same-sex couples to whom the officials issued marriage licenses, solemnized marriage ceremonies, or registered marriage certificates, (2) notify these couples that this court has determined that same-sex marriages that have been performed in California are void from their inception and a legal nullity, and that these officials have been directed to correct their records to reflect the invalidity of these marriage licenses and marriages, (3) provide these couples an opportunity to

---

[41] Contrary to the contention of Justice Werdegar's concurring and dissenting opinion (*post*, at p. 1133), should the existing marriage statutes ultimately be held unconstitutional, we do not believe that the principle of "basic fairness" or a claim for "full relief" justifies placing the same-sex couples who took advantage of the unauthorized actions of San Francisco officials in a different or better position than other same-sex couples who were denied marriage licenses in other counties throughout the state by public officials who properly fulfilled their duties in compliance with the governing state statutes.

demonstrate that their marriages are not same-sex marriages and thus that the official records of their marriage licenses and marriages should not be revised, (4) offer to refund, upon request, all marriage-related fees paid by or on behalf of same-sex couples, and (5) make appropriate corrections to all relevant records.

## VIII

As anyone familiar with the docket of the United States Supreme Court, of this court, or of virtually any appellate court in this nation is aware, many statutes currently in force may give rise to constitutional challenges, and not infrequently the constitutional questions presented involve issues upon which reasonable persons, including reasonable jurists, may disagree. If every public official who is under a statutory duty to perform a ministerial act were free to refuse to perform that act based solely on the official's view that the underlying statute is unconstitutional, any semblance of a uniform rule of law quickly would disappear, and constant and widespread judicial intervention would be required to permit the ordinary mechanisms of government to function. This, of course, is not the system of law with which we are familiar. Under long-established principles, a statute, once enacted, is presumed to be constitutional until it has been judicially determined to be unconstitutional.

An executive official, of course, is free to criticize existing statutes, to advocate their amendment or repeal, and to voice an opinion as to their constitutionality or unconstitutionality. As we have explained, however, an executive official who is charged with the ministerial duty of enforcing a statute generally has an obligation to execute that duty in the absence of a judicial determination that the statute is unconstitutional, regardless of the official's personal view of the constitutionality of the statute.

In this case, the city has suggested that a contrary rule—one under which a public official charged with a ministerial duty would be free to make up his or her own mind whether a statute is constitutional and whether it must be obeyed—is necessary to protect the rights of minorities. But history demonstrates that members of minority groups, as well as individuals who are unpopular or powerless, have the most to lose when the rule of law is abandoned—even for what appears, to the person departing from the law, to be a just end.[42] As observed at the outset of this opinion, granting every

---

[42] The pronouncement of Sir Thomas More in the well-known passage from Robert Bolt's A Man For All Seasons comes to mind:

"Roper: So now you'd give the Devil benefit of law!

"More: Yes. What would you do? Cut a great road through the law to get to the Devil?

"Roper: I'd cut down every law in England to do that!

public official the authority to disregard a ministerial statutory duty on the basis of the official's opinion that the statute is unconstitutional would be fundamentally inconsistent with our political system's commitment to John Adams's vision of a government where official action is determined not by the opinion of an individual officeholder—but by the rule of law.

## IX

For the reasons discussed above, a writ of mandate shall issue compelling respondents to comply with the requirements and limitations of the current marriage statutes in performing their ministerial duties under such statutes, and directing the county clerk and the county recorder of the City and County of San Francisco to take the following corrective actions under the supervision of the California Director of Health Services: (1) identify all same-sex couples to whom the officials issued marriage licenses, solemnized marriage ceremonies, or registered marriage certificates, (2) notify these couples that this court has determined that same-sex marriages that have been performed in California are void from their inception and a legal nullity, and that these officials have been directed to correct their records to reflect the invalidity of these marriage licenses and marriages, (3) provide these couples an opportunity to demonstrate that their marriages are not same-sex marriages and thus that the official records of their marriage licenses and marriages should not be revised, (4) offer to refund, upon request, all marriage-related fees paid by or on behalf of same-sex couples, and (5) make appropriate corrections to all relevant records.

As the prevailing parties, petitioners shall recover their costs.

Baxter, J., Chin, J., Brown, J., and Moreno, J., concurred.

**MORENO, J.**—I concur. The majority opinion addresses primarily the limitations on the power of local officials to disobey statutes that may be, but have not yet been judicially established to be, unconstitutional. I write separately to focus on the related but distinct question of what courts should do when confronted with such disobedience on the part of local officials. As the majority opinion suggests, a court should not invariably refuse to decide constitutional questions arising from local governments' or local officials' refusal to obey purportedly unconstitutional statutes. Indeed, California courts

---

"More: Oh? And when the last law was down, and the Devil turned round on you—where would you hide, Roper, the laws all being flat? This country's planted thick with laws from coast to coast—man's laws, not God's—and if you cut them down—and you're just the man to do it—d'you really think you could stand upright in the winds that would blow then? Yes, I'd give the Devil benefit of law, for my own safety's sake." (Bolt, A Man for All Seasons (1962) p. 66.)

under these circumstances have, on a number of occasions, decided the underlying constitutional questions. In the present case, the majority declines to decide the constitutional validity of Family Code section 300, prohibiting same-sex marriage, but instead concludes that a writ of mandate against San Francisco's (the city's) local officials is justified because they exceeded their ministerial authority. As elaborated below, I agree that under these somewhat unusual circumstances, local officials' disobedience of the statute justifies this court's issuance of a writ of mandate against those officials before the underlying constitutional question has been adjudicated.

At the outset, I review the requirements for obtaining a writ of mandate. To obtain writ relief a petitioner must show: " '(1) A clear, present and usually ministerial duty on the part of the respondent . . . ; and (2) a clear, present and beneficial right in the petitioner to the performance of that duty . . . .' " (*Santa Clara County Counsel Attys. Assn. v. Woodside* (1994) 7 Cal.4th 525, 539–540 [28 Cal.Rptr.2d 617, 869 P.2d 1142].) Also required is "the lack of any plain, speedy and adequate remedy in the usual course of law . . . ." (*Flora Crane Service, Inc. v. Ross* (1964) 61 Cal.2d 199, 203 [37 Cal.Rptr. 425, 390 P.2d 193].) Although the writ of mandate generally must issue if the above requirements are clearly met (see *May v. Board of Directors* (1949) 34 Cal.2d 125, 133–134 [208 P.2d 661]), the writ of mandate is an equitable remedy that will not issue if it is contrary to "promoting the ends of justice." (*McDaniel v. City etc. of San Francisco* (1968) 259 Cal.App.2d 356, 361 [66 Cal.Rptr. 384]; see also *Bartholomae Oil Corp. v. Superior Court* (1941) 18 Cal.2d 726, 730 [117 P.2d 674].)

The local officials in the present case have a clear ministerial duty to issue marriage licenses in conformance with state statute and have violated that duty. The Attorney General, and for that matter the petitioners in *Lewis v. Alfaro*, have a substantial right to ensure that marriage licenses conform to the statute. (See *Bd. of Soc. Welfare v. County of L.A.* (1945) 27 Cal.2d 98, 100–101 [162 P.2d 627].) But when a court is asked to grant a writ of mandate to enforce a statute over which hangs a substantial cloud of unconstitutionality, the above-stated principles dictate that a court at least has the discretion to refuse to issue the writ until the underlying constitutional question has been decided.

How should courts exercise that discretion? In California, generally speaking, courts faced with local governments' or local officials' refusal to obey assertedly unconstitutional statutes have decided the constitutional question before determining whether a writ or other requested relief should issue. (See, e.g., *County of Riverside v. Superior Court* (2003) 30 Cal.4th 278 [132 Cal.Rptr.2d 713, 66 P.3d 718] [county refused to obey as unconstitutional a state statute mandating binding arbitration for local agencies that reach

negotiating impasse with police and firefighters]; *Star-Kist Foods, Inc. v. County of Los Angeles* (1986) 42 Cal.3d 1 [227 Cal.Rptr. 391, 719 P.2d 987] [county refused to act in accordance with a state revenue statute it had judged, correctly, to violate the U.S. Const.]; *Zee Toys, Inc. v. County of Los Angeles* (1978) 85 Cal.App.3d 763, 777–781 [149 Cal.Rptr. 750] [same]; *Paso Robles etc. Hospital Dist. v. Negley* (1946) 29 Cal.2d 203 [173 P.2d 813] [local financial officer refused to issue bonds and defended a lawsuit in order to expeditiously settle the constitutional validity of the bond issue]; *Denman v. Broderick* (1896) 111 Cal. 96, 105 [43 P. 516] [local official refused to spend public funds required by a statute believed to be unconstitutional "special legislation"]; *City of Oakland v. Digre* (1988) 205 Cal.App.3d 99 [252 Cal.Rptr. 99] [local official refused to enforce a parcel tax believed to be unconstitutional and required the city to demonstrate its constitutionality in court]; *Bayside Timber Co. v. Board of Supervisors* (1971) 20 Cal.App.3d 1, 14–15 [97 Cal.Rptr. 431] [county board of supervisors refused to issue permission for timber operations, although such refusal was not authorized under rules promulgated pursuant to state statute].) Indeed, any time a city determines that a state law is contrary to its own constitutional prerogative of self-governance and therefore refuses to obey the law, it is making a constitutional determination. (See, e.g., *Bishop v. City of San Jose* (1969) 1 Cal.3d 56, 63–64 [81 Cal.Rptr. 465, 460 P.2d 137] [determining that state prevailing wage law for public works projects was not binding on cities].)

As the majority states, "the classic understanding of the separation of powers doctrine [is] that the legislative power is the power to enact statutes, the executive power is the power to execute or enforce statutes, and the judicial power is the power to interpret statutes and to determine their constitutionality." (Maj. opn., *ante*, at p. 1068.) But "the separation of powers doctrine does not create an absolute or rigid division of functions." (*Ibid.*) As the above cases suggest, local officials sometimes exercise their authority to *preliminarily* determine that a statute that directly affects the local government's functioning is unconstitutional and, in some circumstances, refuse to obey that statute as a means of bringing the constitutional challenge. This preliminary determination is the exercise of an *executive* function. Local officials and agencies do not "arrogate to [the local executive] core functions of [the judicial] branch" in violation of the separation of powers (*Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 297 [105 Cal.Rptr.2d 636, 20 P.3d 533]), but rather raise constitutional issues for the courts to ultimately decide.

In my view, there are at least three types of situations in which a local government's disobedience of a statute would be reasonable. In these situations, courts asked to grant a writ of mandate to compel the local agency to obey the statute should therefore address the underlying constitutional issue rather than simply conclude the local governmental entity exceeded its

ministerial authority. First, there are some cases in which the statute in question violates a "clearly established . . . constitutional right" (*Harlow v. Fitzgerald* (1982) 457 U.S. 800, 818 [73 L.Ed.2d 396, 102 S.Ct. 2727]). An executive decision not to spend resources to comply with a clearly unconstitutional statute is a reasonable exercise of the local executive power and does not usurp a core judicial function. Indeed, refusing to enforce clearly unconstitutional statutes saves the resources of both the executive and the judiciary.

A second category of "disobedience" cases involves a local official or governmental entity disobeying a statute when there is a substantial question as to its constitutionality *and* the statute governs matters integral to a locality's limited power of self-governance. In these cases, a local entity or official is directly affected by the statute and in a unique position to challenge it. As the above cases illustrate, local entities and officials have challenged statutes to determine the validity of a bond, or the payment of a government salary for a position unconstitutionally created, or an exemption to a local tax that assertedly violates the commerce clause, or a statute that intrudes on local matters of city or county employee compensation. It is noteworthy that in virtually all the above cases, the local agency's or official's refusal to obey an assertedly unconstitutional statute had the effect of preserving the status quo, pending judicial resolution of the matter, thereby minimizing interference with the judicial function.

Perhaps in some of these cases localities could have proceeded by obtaining declaratory relief as to a statute's unconstitutionality, rather than by disobeying the statute. In other cases, an actual controversy necessary for declaratory relief may have been lacking. In any case, the fact that the local government agency did not proceed by means of declaratory relief provided no insurmountable obstacle to a court's deciding the underlying constitutional issue raised by the agency's disobedience. (See, e.g., *County of Riverside v. Superior Court, supra,* 30 Cal.4th 278, 283.)[1] Of course, if a court determines that interim relief to compel a government agency to obey a statute is appropriate, it may grant such relief before the constitutional question is ultimately adjudicated.

A third possible category of cases in which city officials might legitimately disobey statutes of doubtful constitutionality are those in which the question of a statute's constitutionality is substantial, and irreparable harm may result to individuals to which the local government agency has some protective

---

[1] The above dictum does not apply when the Legislature has required that a governmental entity challenge an assertedly unconstitutional statute by means of declaratory relief. (See, e.g., Rev. & Tax. Code, § 538 [county assessor to challenge constitutionality of state revenue statute by requesting declaratory relief under Code Civ. Proc., § 1060].)

obligation—be they employees, or students of a public college, or patrons of a public library, or patients in a public hospital, or in some cases simply residents of the city. Again, a court asked to grant a writ of mandate could conclude that a delay in granting the writ pending resolution of the underlying constitutional question is justified. To issue a writ enforcing a statute that may be unconstitutional, and that will work irreparable harm, would not "promot[e] the ends of justice" (*McDaniel v. City etc. of San Francisco, supra,* 259 Cal.App.2d at pp. 360–361), and a court has the discretion to delay such issuance until the underlying constitutional question is resolved.

The present case is quite different from the above situations. First, as the majority demonstrates, the unconstitutionality of Family Code section 300 is not clearly established by either state or federal constitutional precedent, and certainly not from the language of the constitutional provisions themselves. Nor does this case pertain to a statute that interferes with a city's or county's limited power of self-governance that these entities are in a unique position to challenge. Rather, local officials in this case perform a ministerial function pursuant to the state marriage law. Unlike the cases cited above, in which the constitutionality of a statute is likely to go unchallenged if a local governmental entity does not do so, Family Code section 300 limits individual rights, and those individuals subject to that limitation are in the best position to challenge it.

Nor does the present case fit the third category of cases, in which a city refuses to enforce a law so as to protect its citizens from irreparable harm. The only harm caused here is a delay in the ability of same-sex couples to get married while the constitutional issue is being adjudicated. But that delay will occur whether or not we grant a writ of mandate against the city in this case. Put another way, local officials have no real power to marry same-sex couples, given the statutory prohibition against doing so. What *was* within their power, prior to our issuance of a stay, was to issue licenses of indeterminate legal status. The exercise of the court's mandate power to preclude local officials from continuing this course of action, and voiding the licenses already issued, brings no irreparable harm to the individuals who have received or might receive such licenses.

In sum, the city advances no plausible reason why it had to disobey the statute in question. Even so, it might have been appropriate to have delayed the issuance of a writ of mandate against it until the underlying constitutional question had been adjudicated if, for example, the city had issued a single "test case" same-sex marriage license. But it went far beyond a test case. It issued thousands of these marriage licenses. As such, the city went well beyond making a preliminary determination of the statute's unconstitutionality or performing an act that would bring the constitutional issue to the

courts. Rather, city officials drastically and repeatedly altered the status quo based on their constitutional determination, issuing a multitude of licenses that purported to have an independent legal effect, contrary to their ministerial duty and statutory obligation and prior to any judicial determination of the statute's unconstitutionality. By such dramatic overreaching, these officials trespassed on a core judicial function of deciding the constitutionality of statutes and endowed the issue of their authority to disobey the statute with a life of its own, independent of the underlying constitutional issue. I therefore agree with the majority that a writ of mandate is rightly issued against the city and its officials in this case.

I reiterate what is clear in the majority opinion. Our holding in this case in no way expresses or implies a view on the underlying issue of the constitutionality of a statute prohibiting same-sex marriage. That issue will be addressed in the context of litigation in which the issue is properly raised. (See *Goodridge v. Department of Pub. Health* (2003) 440 Mass. 309 [798 N.E.2d 941].)

**KENNARD, J.,** Concurring and Dissenting.—I concur in the judgment, except insofar as it declares void some 4,000 marriages performed in reliance on the gender-neutral marriage licenses[1] issued in the City and County of San Francisco. Although I agree with the majority that San Francisco public officials exceeded their authority when they issued those licenses, and that the licenses themselves are therefore invalid, I would refrain from determining here, in a proceeding from which the persons whose marriages are at issue have been excluded, the validity of the marriages solemnized under those licenses. That determination should be made after the constitutionality of California laws restricting marriage to opposite-sex couples has been authoritatively resolved through judicial proceedings now pending in the courts of California.

**I**

Like the majority, I conclude that officials in the City and County of San Francisco exceeded their authority when they issued gender-neutral marriage licenses to same-sex couples, and I agree with the majority that those officials may not justify their actions on the ground that state laws restricting marriage to opposite-sex couples violate the state or the federal Constitution. The cases discussed by the majority demonstrate, in my view, that a public official may refuse to enforce a statute on constitutional grounds only in these situations:

---

[1] As the majority explains, the license application was altered "by eliminating the terms 'bride,' 'groom,' and 'unmarried man and unmarried woman,' and by replacing them with the terms 'first applicant,' 'second applicant,' and 'unmarried individuals.' " (Maj. opn., *ante*, at p. 1071.)

(1) when the statute's unconstitutionality is obvious beyond dispute in light of unambiguous constitutional language or controlling judicial decisions; (2) when refraining from enforcement is necessary to preserve the status quo and to prevent irreparable harm pending judicial determination of a legitimate and substantial constitutional question about the statute's validity; (3) when enforcing the statute could put the public official at risk for substantial personal liability; or (4) when refraining from enforcement is the only practical means to obtain a judicial determination of the constitutional question. (See Field, The Effect of an Unconstitutional Statute (1935, reprint ed. 1971) p. 119 et seq.; Note, *Right of Ministerial Officer to Raise Defense of Unconstitutionality in Mandamus Proceeding* (1931) 15 Minn. L.Rev. 340; Rapacz, *Protection of Officers Who Act Under Unconstitutional Statutes* (1927) 11 Minn. L.Rev. 585; Note, *Who Can Set Up Unconstitutionality— Whether Public Official Has Sufficient Interest* (1920) 34 Harv. L.Rev. 86.) Because none of these situations is present here, as I explain below, the public officials acted wrongly in refusing to enforce the opposite-sex restriction in California's marriage laws.

### A. *Indisputably Unconstitutional Law*

In restricting marriages to couples consisting of one woman and one man, California's marriage laws are not plainly or obviously unconstitutional under either the state or the federal Constitution. Neither Constitution expressly prohibits limiting marriage to opposite-sex couples, and neither Constitution expressly grants any person a right to marry someone of the same sex. Nor does any judicial decision establish beyond reasonable dispute that restricting marriage to heterosexual couples violates any provision of the California Constitution or the United States Constitution.

Indeed, there is a decision of the United States Supreme Court, binding on all other courts and public officials, that a state law restricting marriage to opposite-sex couples does *not* violate the federal Constitution's guarantees of equal protection and due process of law. After the Minnesota Supreme Court held that Minnesota laws preventing marriages between persons of the same sex did not violate the equal protection or due process clauses of the United States Constitution (*Baker v. Nelson* (1971) 291 Minn. 310 [191 N.W.2d 185]), the decision was appealed to the United States Supreme Court, as federal law then permitted (see 28 U.S.C. former § 1257(2), 62 Stat. 929 as amended by 84 Stat. 590). The high court later dismissed that appeal "for want of substantial federal question." (*Baker v. Nelson* (1972) 409 U.S. 810 [34 L.Ed.2d 65, 93 S.Ct. 37].)

As the United States Supreme Court has explained, a dismissal on the ground that an appeal presents no substantial federal question is a decision on

the merits of the case, establishing that the lower court's decision on the issues of federal law was correct. (*Mandel v. Bradley* (1977) 432 U.S. 173, 176 [53 L.Ed.2d 199, 97 S.Ct. 2238]; *Hicks v. Miranda* (1975) 422 U.S. 332, 344 [45 L.Ed.2d 223, 95 S.Ct. 2281].) Summary decisions of this kind "prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions." (*Mandel v. Bradley, supra,* at p. 176.) Thus, the high court's summary decision in *Baker v. Nelson, supra,* 409 U.S. 810, prevents lower courts and public officials from coming to the conclusion that a state law barring marriage between persons of the same sex violates the equal protection or due process guarantees of the United States Constitution.

The binding force of a summary decision on the merits continues until the high court instructs otherwise. (*Hicks v. Miranda, supra,* 422 U.S. at p. 344.) That court may release lower courts from the binding effect of one of its decisions on the merits either by expressly overruling that decision or through " 'doctrinal developments' " that are necessarily incompatible with that decision. (*Id.* at p. 344.) The United States Supreme Court has not expressly overruled *Baker v. Nelson, supra,* 409 U.S. 810, nor do any of its later decisions contain doctrinal developments that are necessarily incompatible with that decision.

The San Francisco public officials have argued that the United States Supreme Court's decision in *Lawrence v. Texas* (2003) 539 U.S. 558 [156 L.Ed.2d 508, 123 S.Ct. 2472], holding unconstitutional a state law "making it a crime for two persons of the same sex to engage in certain intimate sexual conduct" (*id.* at p. 562), amounts to a doctrinal development that releases courts and public officials from any obligation to obey the high court's decision in *Baker v. Nelson, supra,* 409 U.S. 810. Although *Lawrence* represents a significant shift in the high court's view of constitutional protections for same-sex relationships, the majority in *Lawrence* carefully pointed out that "there is no longstanding history in this country of laws directed at homosexual conduct as a distinct matter" (*Lawrence v. Texas, supra,* at p. 568) and that the case "d[id] not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter" (*id.* at p. 578). Because there is a long history in this country of defining marriage as a relation between one man and one woman, and because marriage laws do involve formal government recognition of relationships, the high court's decision in *Lawrence* did not undermine the authority of *Baker v. Nelson* to such a degree that a lower federal or state court, much less a public official, could disregard it. Until the United States Supreme Court says otherwise, which it has not yet done, *Baker v. Nelson* defines federal constitutional law on the question whether a state may deny same-sex couples the right to marry.

Because neither the federal nor the California Constitution contains any provision directly and expressly guaranteeing a right to marry another person of the same sex, and because no court has ever decided that either Constitution confers that right, this is not a situation in which a public official refused to enforce a law that was obviously and indisputably unconstitutional.

## B. *Preserving the Status Quo to Prevent Serious Harm*

Nor was this a situation in which a public official, by temporarily refraining from enforcing a state law, merely preserved the status quo to prevent potentially irreparable harm pending judicial determination of a legitimate and substantial constitutional question about the law's validity. By issuing licenses authorizing same-sex marriages, the San Francisco public officials did not preserve a status quo, but instead they altered the status quo in that California law has always prohibited same-sex marriage.

In 1977, the Legislature amended Family Code section 300 to specify that marriage is a relation "between a man and a woman." (See maj. opn., *ante*, at p. 1076, fn. 11.) At the March 2000 election, the voters approved Proposition 22, which enacted Family Code section 308.5 declaring that "[o]nly marriage between a man and a woman is valid or recognized in California."[2] But those statutory measures did not change existing law. Since the earliest days of statehood, California has recognized only opposite-sex marriages. (See, e.g., *Mott v. Mott* (1890) 82 Cal. 413, 416 [22 P. 1140] [quoting legal dictionary's definition of marriage as a contract " 'by which a man and woman reciprocally engage to live with each other during their joint lives, and to discharge toward each other the duties imposed by law on the relation of husband and wife' "].) In issuing gender-neutral marriage licenses, therefore, San Francisco public officials could not have intended merely a temporary or interim preservation of an existing state of affairs pending a judicial determination of a newly enacted law's constitutionality. Instead, as their public statements indicated, they issued those licenses to effect a fundamental and permanent change in traditional marriage eligibility requirements, based on their own views about constitutional questions. In so doing, they exceeded their authority.

## C. *Public Officials' Personal Liability*

This was not a situation in which public officials had reason to fear they might be held personally liable in damages for enforcing a constitutionally

---

[2] Although California law has expressly restricted matrimony to heterosexual couples, it has also extended most of the financial and other benefits of marriage to same-sex couples through domestic partner legislation. (See, e.g., Fam. Code, § 297 et seq., Stats. 2003, ch. 421, operative Jan. 1, 2005.)

invalid state law. In a federal civil rights action brought under 42 United States Code section 1983, a public official may not be held personally liable for enforcing a state law that violates a federal constitutional right unless the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." (*Anderson v. Creighton* (1987) 483 U.S. 635, 640 [97 L.Ed.2d 523, 107 S.Ct. 3034]; accord, *Saucier v. Katz* (2001) 533 U.S. 194, 202 [150 L.Ed.2d 272, 121 S.Ct. 2151]; *Wilson v. Layne* (1999) 526 U.S. 603, 614–615 [143 L.Ed.2d 818, 119 S.Ct. 1692].) Because the United States Supreme Court has determined that a state law prohibiting same-sex marriage does not violate the federal Constitution (*Baker v. Nelson, supra,* 409 U.S. 810), no reasonable public official could conclude that denying marriage licenses to same-sex couples would violate a right that was clearly established under the federal Constitution. Accordingly, federal civil rights law could not impose personal liability on local officials in California for enforcing California's same-sex marriage prohibition. "[A]bsent contrary direction, state officials and those with whom they deal are entitled to rely on a presumptively valid state statute, enacted in good faith and by no means plainly unlawful." (*Lemon v. Kurtzman* (1973) 411 U.S. 192, 208–209 [36 L.Ed.2d 151, 93 S.Ct. 1463] (plur. opn. of Burger, C. J.).)

Nor was there any reasonable basis for local officials to anticipate personal liability under the California Constitution or California civil rights laws for denying marriage licenses to same-sex couples. Government Code section 820.6 provides immunity for public employees acting in good faith, without malice, under a statute that proves to be unconstitutional. Because same-sex marriage has never been legally authorized in California, the California Constitution does not expressly grant a right to same-sex marriage, and no judicial decision by any California court has ever suggested, much less held, that state laws limiting marriage to opposite-sex couples violate the California Constitution, Government Code section 820.6 would immunize any public official from personal liability for enforcing the same-sex marriage prohibition should that prohibition, at some later time, be held to violate the California Constitution.

## D. *Necessity of Nonenforcement to Obtain Judicial Resolution*

Finally, this is not a situation in which a public official's nonenforcement of a law was the only practical way to obtain a judicial determination of that law's constitutionality. Just as the constitutionality of California's prohibition against interracial marriage was properly challenged by a mixed-race couple who were denied a marriage license (*Perez v. Sharp* (1948) 32 Cal.2d 711 [198 P.2d 17]), the constitutionality of California's prohibition against same-sex marriage could have been readily challenged at any time through a lawsuit brought by a same-sex couple who had been denied a marriage

license. Indeed, challenges of this sort are now pending in the superior court. (See maj. opn., *ante*, at p. 1117.)

### E. *Policy Grounds for General Rule Prohibiting Nonenforcement on Constitutional Grounds*

As the majority points out (maj. opn., *ante*, at pp. 1067–1068, 1108–1109), confusion and chaos would ensue if local public officials in each of California's 58 counties could separately and independently decide not to enforce long-established laws with which they disagreed, based on idiosyncratic readings of broadly worded constitutional provisions. To ensure uniformity and consistency in the statewide application and enforcement of duly enacted and presumptively valid statutes, the authority of public officials to decline enforcement of state laws, in the absence of a judicial determination of invalidity, based on the officials' own constitutional determinations, is and must be carefully and narrowly limited. I agree with the majority that San Francisco public officials exceeded those limits when they declined to enforce state marriage laws by issuing gender-neutral marriage licenses to same-sex couples.

### II

Although I agree with the majority that San Francisco officials exceeded their authority when they issued gender-neutral marriage licenses to same-sex couples, I do not agree with all the reasoning that the majority offers in support of that conclusion. In particular, I do not agree that a "line of decisions" had established, before the 1978 enactment of section 3.5 of article III of the California Constitution, that "only administrative agencies constitutionally authorized to exercise judicial power have the authority to determine the constitutional validity of statutes." (Maj. opn., *ante*, at p. 1096.)

The majority does not identify any pre-1978 decision holding that a nonconstitutional administrative agency, during quasi-judicial administrative proceedings, lacked authority to determine a statute's constitutionality. The majority asserts that this court so held in *State of California v. Superior Court (Veta)* (1974) 12 Cal.3d 237. (Maj. opn., *ante*, at p. 1092.) But this court there decided only that the doctrine of exhaustion of administrative remedies did not apply to a constitutional challenge to the statute from which the administrative agency derived its authority. (*State of California v. Superior Court (Veta)*, *supra*, at p. 251.) In concluding that a litigant was not *required* during quasi-judicial administrative proceedings to make a constitutional challenge to the statute that created the agency, this court explained that "[i]t would be heroic indeed to compel a party to appear before an administrative body to challenge its very existence and to expect a dispassionate hearing before its

preponderantly lay membership on the constitutionality of the statute establishing its status and functions." (*Ibid.*) This court did not state, or even imply, that an administrative agency *lacked authority* to resolve constitutional issues that a litigant might present.

I also see no need for, and do not join, the majority's observations on topics far removed from the issue presented here, such as the powers of the President of the United States (maj. opn., *ante*, at p. 1098, fn. 26) and the existence of certain legal defenses to war crimes charges (*id.* at p. 1101, fn. 30). These issues are not before this court.

## III

Because I agree with the majority that San Francisco's public officials exceeded their authority when they issued gender-neutral marriage licenses to same-sex couples, I concur in the judgment insofar as it requires those officials to comply with state marriage laws, to identify the same-sex couples to whom gender-neutral marriage licenses were issued, to notify those couples that their marriage licenses are invalid, to offer refunds of marriage license fees collected, and to make appropriate corrections to all relevant records. But I would not require notification that the marriages themselves "are void from their inception and a legal nullity." (Maj. opn., *ante*, at p. 1118.)

Although a marriage license is a requirement for a valid marriage (Fam. Code, §§ 300, 350), some defects in a marriage license do not invalidate the marriage. (See *id.,* § 306; see also, e.g., *Argonaut Ins. Co. v. Industrial Acc. Com.* (1962) 204 Cal.App.2d 805, 809 [23 Cal.Rptr. 1] [applicant's use of false names on license application did not invalidate marriage].) Whether the issuance of a gender-neutral license to a same-sex couple, in violation of state laws restricting marriage to opposite-sex couples, is a defect that precludes any possibility of a valid marriage may well depend upon resolution of the constitutional validity of that statutory restriction. If the restriction is constitutional, then a marriage between persons of the same sex would be a legal impossibility, and no marriage would ever have existed. But if the restriction violates a fundamental constitutional right, the situation could be quite different. A court might then be required to determine the validity of same-sex marriages that had been performed *before* the laws prohibiting those marriages had been invalidated on constitutional grounds.

When a court has declared a law unconstitutional, questions about the effect of that determination on prior actions, events, and transactions "are among the most difficult of those which have engaged the attention of courts, state and federal, and it is manifest from numerous decisions that an

all-inclusive statement of a principle of absolute retroactive invalidity cannot be justified." (*Chicot County Dist. v. Bank* (1940) 308 U.S. 371, 374 [84 L.Ed. 329, 60 S.Ct. 317]; accord, *Lemon v. Kurtzman, supra,* 411 U.S. at p. 198.) This court has acknowledged that, in appropriate circumstances, an unconstitutional statute may be judicially reformed to retroactively extend its benefits to a class that the statute expressly but improperly excluded. (*Kopp v. Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 624–625 [47 Cal.Rptr.2d 108, 905 P.2d 1248] (lead opn. of Lucas, C. J.), 685 (conc. & dis. opn. of Baxter, J.) [joining in pt. III of lead opn.].) Thus, it is possible, though by no means certain, that if the state marriage laws prohibiting same-sex marriage were held to violate the state Constitution, same-sex marriages performed before that determination could then be recognized as valid.

Although the United States Supreme Court has determined that there is no right to same-sex marriage under the federal Constitution (*Baker v. Nelson, supra,* 409 U.S. 810), courts in other states construing their own state Constitutions in recent years have reached differing conclusions on this question. (Compare *Goodridge v. Dept. of Public Health* (2003) 440 Mass. 309 [798 N.E.2d 941] [denying marriage licenses to same-sex couples violates Massachusetts Constitution] with *Standhardt v. Sup. Ct.* (2003) 206 Ariz. 276 [77 P.3d 451] [no right to same-sex marriage under Arizona Constitution].) Recognizing the difficulty and seriousness of the constitutional question, which is now presented in pending superior court actions, this court has declined to address it in this case. *Until that constitutional issue has been finally resolved under the California Constitution,* it is premature and unwise to assert, as the majority essentially does, that the thousands of same-sex weddings performed in San Francisco were empty and meaningless ceremonies in the eyes of the law.

For many, marriage is the most significant and most highly treasured experience in a lifetime. Individuals in loving same-sex relationships have waited years, sometimes several decades, for a chance to wed, yearning to obtain the public validation that only marriage can give. In recognition of that, this court should proceed most cautiously in resolving the ultimate question of the validity of the same-sex marriages performed in San Francisco, even though those marriages were performed under licenses issued by San Francisco public officials without proper authority and in violation of state law. Because the licenses were issued without proper authorization, and in the absence of a judicial determination that the state laws prohibiting same-sex marriage are unconstitutional, employers and other third parties would be under no legal obligation to recognize the validity of any of the same-sex marriages at issue here. Should the pending lawsuits ultimately be resolved by a determination that the opposite-sex marriage restriction is

constitutionally invalid—an issue on which I express no opinion—it would then be the appropriate time to address the validity of previously solemnized same-sex marriages.

**WERDEGAR, J.,** Concurring and Dissenting.—I agree with the majority that San Francisco officials violated the Family Code by licensing marriages between persons of the same sex. Accordingly, I concur in the decision to order those officials to comply with the existing marriage statutes unless and until they are determined to be unconstitutional. Because constitutional challenges are pending in the lower courts, to order city officials not to license additional same-sex marriages in the meantime is an appropriate way to preserve the status quo pending the outcome of that litigation. That, however, is the extent of my agreement with the majority.

## I.

I do not join in the majority's decision to address the validity of the marriages already performed and to declare them void. My concern here is not for the future of same-sex marriage. That question is not before us and, like the majority, I intimate no view on it. My concern, rather, is for basic fairness in judicial process. The superior court is presently considering whether the state statutes that limit marriage to "a man and a woman" (e.g., Fam. Code, § 300) violate the state and federal Constitutions. The same-sex couples challenging those statutes claim the state has, without sufficient justification, denied the fundamental right to marry (e.g., *Zablocki v. Redhail* (1978) 434 U.S. 374, 383 [54 L.Ed.2d 618, 98 S.Ct. 673]; *Loving v. Virginia* (1967) 388 U.S. 1, 12 [18 L.Ed.2d 1010, 87 S.Ct. 1817]; *Perez v. Sharp* (1948) 32 Cal.2d 711, 714–715 [198 P.2d 17]) to a class of persons defined by gender or sexual orientation. Should the relevant statutes be held unconstitutional, the relief to which the purportedly married couples would be entitled would normally include recognition of their marriages. By analogy, interracial marriages that were void under antimiscegeny statutes at the time they were solemnized were nevertheless recognized as valid after the high court rejected those laws in *Loving v. Virginia*. (E.g., *Dick v. Reaves* (Okla. 1967) 1967 OK 158 [434 P.2d 295, 298].) By postponing a ruling on this issue, we could preserve the status quo pending the outcome of the constitutional litigation. Instead, by declaring the marriages "void and of no legal effect from their inception" (maj. opn., *ante*, at p. 1113), the majority permanently deprives future courts of the ability to award full relief in the event the existing statutes are held unconstitutional. This premature decision can in no sense be thought to represent fair judicial process.

The majority asserts that "it would not be prudent or wise to leave the validity of these marriages in limbo for what might be a substantial period of

time given the potential confusion (for third parties, such as employers, insurers, or other governmental entities, as well as for the affected couples) that such an uncertain status inevitably would entail." (Maj. opn., *ante*, at p. 1117.) Nowhere in the opinion, however, does the majority note that any same-sex couple has filed a lawsuit seeking the legal benefits of their purported marriage. Nor is the absence of such lawsuits surprising, since any reasonable court would stay such actions pending the outcome of the ongoing constitutional litigation.[1]

The majority's decision to declare the existing marriages void is unfair for the additional reason that the affected couples have not been joined as parties or given notice and an opportunity to appear. On March 12, 2004, we denied all petitions to intervene filed by affected couples. That ruling made sense at the time it was announced because our prior order of March 11, 2004, which specified the issues to be briefed and argued, did not identify the validity of the existing marriages as an issue. Only on April 14, 2004, *after* having denied the petitions to intervene, did the court identify and solicit briefing on the issue of the marriages' validity. To declare marriages void after denying requests by the purported spouses to appear in court as parties and be heard on the matter is hard to justify, to say the least.[2]

The majority counters that "the legal arguments of such couples with regard to the question of the validity of the existing same-sex marriages have been heard and fully considered." (Maj. opn., *ante*, at p. 1116.) But this is a claim a court may not in good conscience make unless it has given, to the persons whose rights it is purporting to adjudicate, notice and the opportunity to appear. This is the irreducible minimum of due process, even in cases involving numerous parties. (See *Mullane v. Central Hanover Tr. Co.* (1950) 339 U.S. 306, 314–315 [94 L.Ed. 865, 70 S.Ct. 652].) Amicus curiae briefs, which any member of the public may ask to file and which the court has no obligation to read, cannot seriously be thought to satisfy these requirements. The majority writes that "requiring each of the thousands of same-sex couples to be named and served as parties in the present action, would add nothing of substance to this proceeding." (Maj. opn., *ante*, at p. 1115.) Of

---

[1] The majority does note that "officials of the federal Social Security Administration had raised questions regarding that agency's processing of name-change applications resulting from California marriages" (maj. opn., *ante*, at p. 1072), but this is unlikely to be a serious problem because San Francisco used a nonstandard, easily recognizable form for licensing same-sex marriages (*id.*, at pp. 1070–1071, 1079).

[2] Compare Code of Civil Procedure section 389, subdivision (a): "A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if . . . (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest . . . ."

course, the same argument can be made in many class actions with respect to the absent members of the class, but due process still gives each class member the right to notice and the opportunity to appear. (*Mullane v. Central Hanover Tr. Co., supra,* 339 U.S. at pp. 314–315.) Here, notice has been given to none of the 4,000 affected couples; and even the 11 same-sex couples who affirmatively sought to intervene were denied the opportunity to appear. (Maj. opn., *ante,* at p. 1116.) What the majority has done, in effect, is to give petitioners the benefit of an action against a defendant class of same-sex couples free of the burden of procedural due process. If the majority truly desired to hear the views of the same-sex couples whose rights it is adjudicating, it would not proceed in absentia.

Aware of this problem, the majority offers a specious imitation of due process by ordering the city to notify the same-sex couples that this court has decided their marriages are void, and to "provide these couples an opportunity to demonstrate that their marriages are not same-sex marriages" before canceling their marriage records. (Maj. opn., *ante,* at pp. 1118–1119; see also *id.,* at p. 1117.) This procedure may prevent the city from mistakenly deleting the records of heterosexual marriages, but it cannot benefit any same-sex couple. Notice after the fact that one's rights have been adjudicated is not due process.

The majority attempts to justify the procedural shortcuts it is taking by invoking the rule that '[a] marriage prohibited as . . . illegal and declared to be "void" or "void from the beginning" is a legal nullity and its validity may be asserted or shown in any proceeding in which the fact of marriage may be material.' " (*Estate of Gregorson* (1911) 160 Cal. 21, 26 [116 P. 60], quoted in maj. opn., *ante,* at p. 1114, italics omitted.) But that rule, until today, has permitted persons other than spouses to challenge the validity of a marriage *only as and when necessary to resolve another issue in the case,* for example, the legitimacy of an heir's claim to property or an assertion of marital privilege. In essence, the *Gregorson* rule simply recognizes that a litigant whose claim or defense depends on the validity or invalidity of a marriage may introduce evidence to prove the point.[3] We have never held that this type of collateral attack on a marriage has any binding effect on *nonparties* to the

---

[3] For example, *Estate of Elliott* (1913) 165 Cal. 339, 343 [132 P. 439] (decedent's daughter may challenge purported marriage of decedent to person seeking appointment as administrator); *Estate of Stark* (1941) 48 Cal.App.2d 209, 215–216 [119 P.2d 961] (heirs may challenge marriage of decedent's parents to show that other purported heirs were illegitimate and, thus, lack standing to contest the will); *People v. Little* (1940) 41 Cal.App.2d 797, 800–801 (the People in a criminal case may challenge defendant's marriage to an alleged coconspirator in order to avoid the rule that spouses cannot commit the crime of conspiracy); *People v. MacDonald* (1938) 24 Cal.App.2d 702, 704–705 [76 P.2d 121] (the People in a criminal case may challenge defendant's marriage to a witness in order to defeat a claim of spousal privilege); *People v. Glab* (1936) 13 Cal.App.2d 528, 535 [57 P.2d 588] (same).

action. A court's refusal in the course of a criminal trial to recognize a claim of marital privilege, for example, does not compel the State Office of Vital Records to destroy a record of the marriage. The majority asserts that the question of the existing marriages' validity or invalidity is material because it is *"central to the scope of the remedy that may and should be ordered in this case."* (Maj. opn., *ante*, at p. 1114, italics added.) But this is just another way of saying the question is material because the Attorney General has asked us to decide it. With this reasoning, the majority assumes the conclusion and converts the *Gregorson* rule into a pretext for denying fundamental fairness.

## II.

I also do not join in the majority's unnecessary, wide-ranging comments on the respective powers of the judicial and executive branches of government.

The ostensible occasion for the majority's comments—a threat to the rule of law (maj. opn., *ante*, at pp. 1068, 1119–1120)—seems an extravagant characterization of recent events. On March 11, 2004, when we assumed jurisdiction and issued an interim order directing San Francisco officials to cease licensing same-sex marriages, those officials immediately stopped. Apparently the only reason they had not stopped earlier is that the lower courts had denied similar applications for interim relief. While city officials evidently understood their oaths of office as commanding obedience to the Constitution rather than to the marriage statutes they believed to be unconstitutional, those officials never so much as hinted that they would not respect the authority of the courts to decide the matter. Indeed, not only did our interim order meet with immediate, unreserved compliance by city officials, but the same order apparently sufficed to recall to duty any other public officials who might privately have been thinking to follow San Francisco's lead. In the meantime, not one of California's 58 counties or over 400 municipalities has licensed a same-sex marriage.

Under these circumstances, I see no justification for asserting a broad claim of power over the executive branch. Make no mistake, the majority does assert such a claim by holding that executive officers must follow statutory rather than constitutional law until a court gives them permission in advance to do otherwise. For the judiciary to assert such power over the executive branch is fundamentally misguided. As the high court has explained, "[i]n the performance of assigned constitutional duties *each branch of the Government must initially interpret the Constitution*, and the interpretation of its powers by any branch is due great respect from the others." (*United States v. Nixon* (1974) 418 U.S. 683, 703 [41 L.Ed.2d 1039, 94 S.Ct. 3090], italics added.) To recognize that an executive officer has the practical freedom to act based on an interpretation of the Constitution that may ultimately prove to be wrong

does not mean the rule of law has collapsed. So long as the courts remain open to hear legal challenges to executive conduct, so long as the courts have power to enjoin such conduct pending final determination of its legality, and so long as the other branches acknowledge the courts' role as " 'ultimate interpreter of the Constitution' " (*id.*, at p. 704, quoting *Baker v. Carr* (1962) 369 U.S. 186, 211 [7 L.Ed.2d 663, 82 S.Ct. 691]) in matters properly within their jurisdiction, no genuine threat to the rule of law exists. San Francisco's compliance with our interim order eloquently demonstrates this.

Furthermore, a rule requiring an executive officer to seek a court's permission before declining to comply with an apparently unconstitutional statute is fundamentally at odds with the separation of powers and, in many cases, unenforceable. The executive branch is necessarily active, managing events as they occur. The judicial branch is necessarily reactive, waiting until invited to serve as neutral referee. The executive branch does not await the courts' pleasure. A rule to the contrary, though perhaps enforceable against local officials in some cases, will be impossible to enforce against executive officers who exercise a greater share of the state's power, such as a Governor or an Attorney General. By happy tradition in this country, executive officers have generally acquiesced in the judicial branch's traditional claim of final authority to resolve constitutional disputes. (*Marbury v. Madison* (1803) 5 U.S. 137, 176 [2 L.Ed. 60]; see also *United States v. Nixon, supra,* 418 U.S. 683, 703.) But a court can never afford to forget that the judiciary "may truly be said to have neither Force nor Will, but merely judgment; and must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments." (Hamilton, The Federalist No. 78 (Willis ed. 1982) p. 394.) Accordingly, we are ill advised to announce categorical rules that will not stand the test of harder cases.

The majority acknowledges that "legislators and executive officials may take into account constitutional considerations in making discretionary decisions within their authorized sphere of action—such as whether to enact or veto proposed legislation or exercise prosecutorial discretion." (Maj. opn., *ante*, at p. 1068.) But the majority views executive officers exercising "ministerial" functions as statutory automatons, denied even the scope to obey their oaths of office to follow the Constitution. (*Ibid.*) Contrary to the majority, I do not find the purported distinction between discretionary and ministerial functions helpful in this context. Were not state officials performing ministerial functions when, strictly enforcing state segregation laws in the years following *Brown v. Board of Education* (1954) 347 U.S. 483 [98 L.Ed. 873, 74 S.Ct. 686], they refused to admit African-American pupils to all-White schools until the courts had applied *Brown*'s decision about a Kansas school system to each state's law? We formerly believed that school officials' oaths of office to obey the Constitution had sufficient gravity in such cases to permit them to obey the higher law, even *before* the courts had

spoken state by state. (*Southern Pac. Transportation Co. v. Public Utilities Com.* (1976) 18 Cal.3d 308, 311, fn. 2 [3d par.] [134 Cal.Rptr. 189, 556 P.2d 289].) So, too, did the United States Supreme Court. (*Cooper v. Aaron* (1958) 358 U.S. 1, 18–20.) Today, in contrast, the majority equivocates on this point (see maj. opn., *ante*, at pp. 1102–1104) and writes that "a public official 'faithfully upholds the Constitution by complying with the mandates of the Legislature, leaving to courts the decision whether those mandates are invalid' " (*id.*, at p. 1100, quoting *Southern Pac. Transportation Co. v. Public Utilities Com., supra,* at p. 319 (conc. & dis. opn. of Mosk, J.)). But as history demonstrates, however convenient the majority's view may be in dealing with subordinate officers within a governmental hierarchy, that view is not entirely correct.

The majority's strong view of judicial power over the executive branch leads it to suggest, albeit without actually so holding, that a state may properly condition on advance judicial approval its executive officers' duty to obey even the *federal* Constitution. The majority writes, for example, that "[t]he city has not cited any case holding that the federal Constitution prohibits a state from defining the authority of a state's executive officials in a manner that requires such officials to comply with a clearly applicable statute unless and until such a statute is judicially determined to be unconstitutional" (maj. opn., *ante*, at p. 1110), and that " 'the power of a public officer to question the constitutionality of a statute as an excuse for refusing to enforce it . . . *is a purely local question*' [citation]—that is, purely a question of state (not federal) law" (*id.*, at pp. 1111–1112, quoting *Smith v. Indiana* (1903) 191 U.S. 138, 148 [48 L.Ed. 125, 24 S.Ct. 51], italics in maj. opn.).[4]

Given that respondent city officials have complied with our interim order to cease issuing same-sex marriage licenses, and that the constitutionality of the existing marriage statutes is presently under review, I consider the majority's determination to speculate about the limits of a state official's duty to obey

---

[4] In *Smith v. Indiana, supra,* 191 U.S. 138, the high court held only that it would not necessarily recognize a state official's *standing* to challenge a state law on federal grounds. (See *id.*, at pp. 148–150.) Even on this narrow point, *Smith* has not been consistently followed. (See *Board of Education v. Allen* (1968) 392 U.S. 236, 241, fn. 5 [20 L.Ed.2d 1060, 88 S.Ct. 1923] [local school officials permitted to challenge under the federal Constitution a state statute requiring them to purchase and loan textbooks to parochial school pupils]; *Coleman v. Miller* (1939) 307 U.S. 433, 438 & fn. 3 [83 L.Ed. 1385, 59 S.Ct. 972] [state legislators permitted to challenge under the federal Constitution state's procedures for recording votes on constitutional amendments]; cf. *id.*, at p. 466 (separate opn. of Frankfurter, J., citing *Smith*); *Akron Board of Ed. v. State Board of Ed. of Ohio* (6th Cir. 1974) 490 F.2d 1285, 1290–1291, cert. den. *sub nom. State Board of Education of Ohio v. Akron Board of Education* (1974) 417 U.S. 932 [41 L.Ed.2d 236, 94 S.Ct. 2644] [local school officials permitted to challenge under the federal Constitution state officials' decision to transfer White students from desegregated schools to all-White schools]; cf. *Akron Board of Ed. v. State Board of Ed. of Ohio, supra,* 490 F.2d at p. 1296 (conc. & dis. opn. of Pratt, J., citing *Smith*).)

the federal Constitution unnecessary and regrettable. A court should not trifle with the doctrine invoked by recalcitrant state officials, in the years following *Brown v. Board of Education, supra,* 347 U.S. 483, to rationalize their delay in complying with the Fourteenth Amendment. The high court definitively repudiated this erroneous doctrine in *Cooper v. Aaron, supra,* 358 U.S. 1, 18: "No state legislator or executive or judicial officer can war against the Constitution without violating his undertaking to support it." The United States Constitution, itself, immediately commands the unqualified obedience of state officials in article VI, section 3, which declares that "all executive and judicial officers, both of the United States *and of the several states,* shall be bound by oath or affirmation, to support this Constitution . . . ." (Italics added; see also *Cooper v. Aaron, supra,* 358 U.S. at pp. 19–20.)

We, as a court, should not claim more power than we need to do our job effectively. In particular, strong claims of judicial power over the executive branch are best left unmade and, if they must be made, are best reserved for cases presenting a real threat to the separation of powers—a threat that provides manifest necessity for the claim, a genuine test of the claim's validity, and a suitable incentive for caution in its articulation. None of these conditions, all of which are necessary to ensure sound decisions in hard cases, is present here.

## III.

In conclusion, I agree with the majority's decision to order city officials not to license additional same-sex marriages pending resolution of the constitutional challenges to the existing marriage statutes. To say more at this time is neither necessary nor wise.